(80 P.3d 1162)
No. 89,462

ROBERT BOOTH ROE, a Minor Child, By and Through his Adoptive Parents, Richard Roe and Janet Roe, and Jennifer Brunetti, Conservator, *Appellants*, v. DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES FOR THE STATE OF KANSAS, THE STATE OF KANSAS, WAYNE SRAMEK, HERBERT HICKMAN, AND MARY KEADY, *Appellees*.

Opinion filed December 19, 2003.

*Robert S. Tomassi*, of Pittsburg, for appellant.

*Deborah June Purce*, of Law Office of Deborah June Purce, of Topeka, for appellee Mary Keady.

*C. William Ossmann*, chief litigation attorney, for appellees State of Kansas and Kansas Department of Social and Rehabilitation Services.

*Matthew W. Boddington*, of Kansas Department of Social and Rehabilitation Services, for appellee Wayne Sramek.

Before KNUDSON, P.J., BEIER and MALONE, JJ.

BEIER, J.: Robert Booth Roe (Baby Roe), his adoptive parents, and his conservator appeal the district court's summary judgment in favor of defendants, the Kansas Department of Social and Rehabilitation Services (SRS), the State of Kansas, and certain SRS employees. Baby Roe suffered catastrophic injury at the hands of his father despite ongoing SRS monitoring of his family situation and the agency's awareness that his mother had warned exactly such an injury could occur.

Baby Roe was born to Terri and Booth Tuthill in Pittsburg on August 6, 1992. Medical personnel and employees of the Tuthills' residential facility had concerns regarding Baby Roe's parents even before his birth. Specifically, SRS was told by letter that Terri exhibited symptoms of psychosis and depression, that she and Booth abused drugs and alcohol, and that Booth physically abused Terri.

Defendant Mary Keady (Keady), an SRS social worker, was assigned to the matter in June 1992. Keady kept some contemporaneous logs of her efforts regarding the Tuthills. However, her supervisor, defendant Wayne Sramek, permitted Keady to add to these logs after Baby Roe was injured.

Keady attempted to meet with Terri three times before Terri delivered Baby Roe. At the first visit, Terri was "very guarded and untrusting and did not want any part [of] SRS' help." On the sec-

ond and third occasions, Terri apparently refused to answer her door.

The day after Baby Roe's birth, the Bureau of Indian Affairs (BIA) was notified, pursuant to the Indian Child Welfare Act, because both parents had Native American ancestry. Booth, in particular, was registered by the Quapaw tribe. The hospital launched meetings among nursing staff, psychiatric staff, SRS staff, and BIA staff that day because of its concerns about the Tuthills' ability to care for Baby Roe. The goal, in Keady's words, was to "insure that [the baby] was safe" when he was discharged with his mother. According to notes taken by Terri's obstetrician:

"A meeting was held with nursing staff, psychiatric staff, SRS staff, and two staff persons from the [BIA], to make arrangements for very close home follow up for mother and baby. It was decided that the [BIA] would handle the home care follow up. Concerns were expressed regarding the welfare of the infant at this meeting. It was felt that the patient was exhibiting fairly good mothering instincts and it was hoped that with close home follow up the infant's status could be evaluated. All personnel were made aware of the potential problem and close home follow up is planned by Lisa Lucher [sic] of the [BIA]."

A hospital social worker recorded the following regarding the discharge plan:

"[BIA's] Sally [Whitecrow-]Ollis, Director of Social Services, and Miss Lisa Luther, Child Protection Worker[,] . . . came to the hospital and did interview Terri and Booth and provided assessment for this couple concerning their follow up needs. Both Miss [Whitecrow-]Ollis and Miss Luther met with [hospital staff], concerning the needs of this couple. It was decided that Lisa would be the contact person for Terri and Booth and would provide daily supervision of their care of the infant. The couple met with the team and it was noted that Terri [was] quite anxious and overwhelmed by the number of people involved in working with her and request was made that she relate to one person, and that one person that she had chosen was Lisa Luther from the Indian Social Services Program. Lisa agreed to provide daily supervision and be accessible to Terri and Booth in caring for their son. Plans were for Terri and the infant to remain in the hospital during the weekend to provide further instruction to her in the care of the infant with plans for her and the baby's discharge on Monday morning, August 10th. Lisa will be at the hospital Monday morning and accompany the couple home from the hospital."

Luther testified about one of the meetings with hospital staff as follows:

"A.: [Luther]: I came to work on the morning of August 7th, 1992, and was told by my supervisor that we were going to Pittsburg, and so we went to Pittsburgh.

"Q.: [Mr. Tomassi]: Your supervisor was Sally Ollis?

"A.: Right. And we went to Pittsburg and met with—there was a worker there, but I can not [sic] recall whether it was from—I know it says the mental health workers, but I can not [sic] recall whether they—who it was, whether they were from Kansas SRS, or the mental health community, or who they were.

"Q.: Would you remember any name?

"A.: No.'

"Q.: Okay. And what was discussed?

. . . .

"A.: From what I can remember the discussion was between Sally Whitecrow-Ollis and the worker—workers. I believe there were two of them. And the discussion was mainly over jurisdiction, who had jurisdiction on the case.

"Q.: All right. Do you recall what was said?

"A.: Yes. Sally was stating that we had jurisdiction. The workers were trying to immediately pull the child from—or terminate Booth and Terry's [sic] parental rights, and Sally was stating that they did not—they had no jurisdiction, that we had jurisdiction, you know, because we administered the social services for the Quapaw tribe at the time. And there was some discussion back and forth and it was determined the workers just, I guess, backed off, just said okay, you guys have jurisdiction."

Whitecrow-Ollis' memory of these events was that Keady wanted BIA to take "complete charge" of the Tuthill case, but that was not "an option." According to Whitecrow-Ollis, BIA agreed to provide parenting education to Terri; SRS did not ask BIA to investigate child abuse reports and did not expect it to pursue such investigations. Whitecrow-Ollis testified that she did not think BIA was capable of providing full-time services, and the plan was that BIA workers would visit the Tuthills only "once or twice a week and assist in teaching [Terri] whatever it was, trying to keep her calm."

Defendants admit that SRS's role was to monitor the services to be provided to the Tuthills after discharge. According to Keady, this monitoring was to include making sure that BIA was providing services and maintaining contact with the mental health center, *i.e.*, to make sure these entities were following through with planned visits and assistance. She stated that her understanding was that BIA would visit the Tuthills for several hours at least twice a week. She testified she did not know what services were to be provided by mental health workers. Finally, Keady also testified

that her role, if she deemed BIA and mental health services to be inadequate, would require her to consult with Sramek and "go from there." Sramek testified that, although it would have been general practice and "possibly would have been appropriate" for SRS to prepare a family services plan for the Tuthills, this was never done. Such a plan would have defined precisely what each agency committed to providing for the family.

Upon discharge from the hospital, Terri and Booth took Baby Roe home to the Oak Place Residential Facility for the mentally ill in Pittsburg. Baby Roe had scored 8 and 9 out of 10 on APGAR birth assessments, and he went home in "good" condition. Health care workers at the residential facility also had documented a care plan. They noted that BIA "agreed to place a worker in the home 8am-5pm[,] Mon[day] thru Fri[day] to help teach Terri how to take care of the baby." They also noted BIA had jurisdiction to determine whether Baby Roe should be placed outside of the family.

Luther conducted at least some of the anticipated home visits to Terri and Baby Roe. She described Terri as lacking "basic parenting skills" and said the same of Booth. Luther did not recall ever meeting with SRS or giving SRS staff written reports about her visits to the Tuthill home. She also did not recall receiving information about Terri or Booth from SRS. She remembered only that Ollis told her Terri was "mildly psychotic" and Booth was "mildly retarded." Luther soon left her position as a BIA child protection worker.

Community mental health worker Jeanne Brown testified in her deposition that BIA workers never spent full weekdays with Terri and Baby Roe. By August 17, Luther had been replaced by BIA worker Linda Turner Smith, and Smith reported that her initial relationship with Terri on that date was "uneasy" because there already had been a lapse of services since Luther's departure. In addition, Whitecrow-Ollis testified that eventually Terri would no longer let Smith into the Tuthill home. Whitecrow-Ollis said she was sure BIA reported this development to SRS as well as mental health workers. Keady testified that she was told as early as August 18 that mental health staff were having trouble getting access to

the Tuthill home. This concerned her, she said, because it made monitoring impossible.

On September 24, 1992, Brown documented a conversation with Terri in which Terri stated she was afraid that Booth would hurt Baby Roe by shaking him too hard and that Terri would be unable to stop him. This was reported to SRS child protection services.

On September 25, 1992, Sramek told Keady about Booth's alleged abuse of Baby Roe. Sramek did not believe the report was "valid," but instructed Keady to "coordinate with [BIA]." He "wanted [BIA workers] to know that [Terri] was making this allegation . . . because [BIA was] one of the primary service providers . . . in case they saw any evidence they could report it . . . so they could look for evidence, if necessary." Sramek nevertheless personally believed that the baby was safe. He said he formed his opinion because of what he understood to be Brown's belief, although he could not recall whether he or Keady or an SRS child protection worker had talked to Brown about the report.

No one from SRS ever visited personally with the Tuthills to follow up on the Brown abuse report, although Brown had agreed to go with an SRS worker to visit the family. Sramek said no one visited because it was determined that the report was not to be believed. This was not the normal SRS procedure, as this passage from Sramek's deposition demonstrates:

"Q. [W]hat would you generally do if you had allegations of a father shaking a two-month old infant, what would you normally do?

"A. Assign it for investigation.

"Q. And did you do that in this case?

"A. No.

"Q. And you knew the mother had mental illness?

"A. Yes.

"Q. And so you know her allegation could have been true or not true?

"A. Yes.

"Q. And you know that the baby could have been in danger just because of the mother's mental illness, is that right?

"A. Yes.

"Q. And you still didn't assign it for investigation?

"A. Because the mandated reporter did not believe the abuse was occurring.

"Q. And if she disagrees with you on that statement, then you've made a serious mistake, haven't you?

"A. Yes."

According to Sramek, Brown was never sent a Notice of Action, which is the form SRS uses to let a mandatory reporter know what was done by the agency in response to an allegation of abuse or neglect. In Sramek's words, Terri's allegation about Booth shaking Baby Roe "went outside of [SRS's] normal practice. [The] report was neither screened out nor screened in, but was passed on to Mary Keady." Keady said in her deposition that she never investigated personally because it would have been an SRS child protection worker's responsibility to do so rather than hers.

Keady testified that she did call BIA, but its office was closed. Although she said that she tracked down a BIA secretary at home, apparently she was told that no one but Whitecrow-Ollis or Smith was acquainted with the family's situation. Whitecrow-Ollis testified she did not recall receiving a telephone call from Keady about the Brown report, and Smith denied ever hearing about the September allegation that Booth had shaken Baby Roe. Keady's logs reflect that she finally had a conversation with Whitecrow-Ollis on September 30 but not that she discussed whether BIA had investigated or would investigate the abuse allegation.

Keady also testified that she called Brown and discussed Terri's abuse allegation. Brown recalled no such conversation and said she would not have minimized the report of Booth's behavior and would not have told SRS that Terri was mentally ill and on medication because it would have been irrelevant. Brown also said she would not have said she did not believe Terri.

On October 7, Keady learned that Brown had contacted SRS again because Terri had left Baby Roe alone. Terri had to be hospitalized in Osawatomie, and Baby Roe was left in the care of his father and a sitter. Keady and Sramek asserted that Brown said she thought Baby Roe's father was doing a good job, but Brown denied ever telling anyone at SRS that the situation was safe. SRS did nothing to follow up on the report of neglect by Terri or to check on how Baby Roe was faring in the care of his father.

On October 12, 1992, Baby Roe was life flighted to Kansas University Medical Center. He was in respiratory distress and had a

"skull fracture, subarachnoid hematoma (bleeding between skull and brain), and . . . (retinal hemorrhages)." He had also had seizures and had required mechanical ventilation.

Booth was convicted of attempted abuse of a child. Terri has since died. Baby Roe is "now permanently and profoundly mentally retarded." His prognosis suggests that he "will never be able to dress himself or to be toilet trained."

Baby Roe, his adoptive parents, and his conservator filed suit against SRS; the State; Herbert Hickman, Sramek's superior at SRS; Sramek; and Keady. Hickman was dismissed from the suit, and the district court entered summary judgment on behalf of the remaining defendants, concluding they owed no legal duty to Baby Roe. The district court wrote:

"In order for plaintiff to have a submiss[i]ble case under [Restatement (Second) of Torts] §324A, there must be evidence that SRS undertook to render services to the plaintiff child's parents, that SRS through affirmative act or agreement assumed an obligation to render services to the child's parents or intended to render services for the benefit of the child's parents and that the services rendered were more than a limited undertaking, that is, such that SRS recognized that they were necessary for the protection of the child. There is just no evidence here that SRS ever rendered services to this child's parents of the quality or nature that is contemplated by § 324A."

Given the summary disposition below, we must resolve all facts and inferences that may reasonably be drawn from the evidence in favor of Baby Roe. Summary judgment is appropriate — and will be upheld on appeal — only when the record conclusively demonstrates there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *P.W. v. Kansas Dept. of SRS,* 255 Kan. 827, 829, 877 P.2d 430 (1994).

The Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.,* provides that, unless a statutory exception applies, a "governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of the state." K.S.A. 2002 Supp. 75-6103(a).

In Kansas, a plaintiff in a negligence action must first prove the existence of a duty owed to him or her by the defendant. The existence of a duty is a question of law, and our review of questions of law is unlimited. *P.W.*, 255 Kan. at 831.

In this case, Baby Roe argues only that a duty arose under Restatement (Second) of Torts § 324A (1964).

Baby Roe does not argue that SRS's statutory duty to investigate child abuse reports was owed to him individually rather than to the public at large. This route was foreclosed to him by prior cases. See *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 496, 921 P.2d 216 (1996) (statute governing SRS investigations created only public duty, not duty to child whose father had been reported for suspected abuse); see also *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 631, 938 P.2d 1293 (1997) (any mandatory term regarding placement in Kansas Manual for Youth Services created only public duty; no duty to individual injured by youth escaping from residential facility); *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, 398, 931 P.2d 26 (1997) (duty to public, not accused child abuser targeted by SRS investigation).

Baby Roe also does not argue that a "special relationship" existed between him and the defendants. See Restatement (Second) of Torts § 315 (1964); *P.W.*, 255 Kan. at 832-33. And he does not assert that a duty arose out of the doctrine of parens patriae. See 255 Kan. at 834-35.

The Kansas Supreme Court adopted § 324A of the second Restatement in *Schmeck v. City of Shawnee*, 232 Kan. 11, Syl. ¶ 4, 651 P.2d 585 (1982). This section provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

In *Schmeck*, plaintiff motorcyclist was injured at an intersection with no left turn light. Our Supreme Court upheld the district court's application of § 324A to find a duty flowing to the plaintiff from the power company responsible for designing the proper traffic signal system for the city. The company had assumed part of the city's duty to keep its streets reasonably safe for their intended use. *Schmeck*, 232 Kan. at 17.

In contrast, the next Supreme Court case in which § 324A was relied upon reversed a jury verdict in favor of a plaintiff, holding no duty had arisen as a matter of law. In that case, *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, 662 P.2d 243 (1983), the court considered whether an architectural firm had potential liability for injuries suffered by workers on a jobsite. The court concluded it did not:

"Absent any showing that the architect affirmatively or by its actions assumed such a duty, we find none in the employment contract. The architect's contractual duties were to get the building constructed as soon as possible in accordance with the plans and specifications and the contract . . . between the contractor and the owner.

. . . .

". . . [T]he defendant has specifically disclaimed any responsibility for safety conditions on the . . . jobsite and, as alleged by plaintiffs, did nothing relative to safety on the jobsite.

. . . .

". . . There is nothing in the record which would support a finding that [defendant] by its actions undertook or could have impliedly assumed responsibility for safety procedures on the jobsite." *Hanna*, 233 Kan. at 212.

Had there been evidence that the architectural firm had actual knowledge of unsafe practices, however, the court made a cryptic suggestion that the analysis could have led elsewhere.

"As a professional, an architect cannot stand idly by with actual knowledge of unsafe safety practices on the jobsite and take no steps to advise or warn the owner or contractor . . . . [I]n such a situation, . . . the plaintiffs still bear the burden of showing the duty owed to them, a breach of that duty, and that the breach was the proximate cause of the injuries suffered. [Defendant] was hired . . . to design a building and to see that the finished product conformed to the plans and specifications. The employment contract . . . did not include responsibility for safety procedures on the jobsite and they did not assume such responsibilities outside the duties imposed by the contract. To the contrary, the

contract specifically provided that the general contractor would assume such duties. [Defendant] was not responsible for the injuries suffered by the plaintiffs." 233 Kan. at 221-22.

Subsequent cases before our Supreme Court and before panels of this court have further refined Kansas' approach to § 324A cases. The initial requirement is an *undertaking* by the defendant. Gratuitously or for consideration, the defendant must have undertaken to render services to another, and the services must be such that the defendant is on notice they are necessary for the protection of a third party. *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, 669, 792 P.2d 993 (1990). The undertaking cannot be purely to serve the purposes of the actor.

" 'Persons pursuing their own interests often benefit others in the process. Accordingly, where a plaintiff seeks to prove an undertaking by conduct which benefits another and that conduct is consistent with a primary purpose on the part of the actor to benefit himself, the plaintiff must offer additional evidence to create a jury question whether there was an undertaking to render services and hence a duty to one who might foreseeably be injured by the actor's failure to perform the undertaking with reasonable care.' " *Gooch*, 246 Kan. at 675 (quoting *Smith v. Allendale Mutual Ins. Co.*, 410 Mich. 685, 303 N.W.2d 702 [1981]).

A defendant's voluntary § 324A undertaking may be implied rather than explicit. See *Hanna*, 233 Kan. at 219 (defendant could have "impliedly" assumed responsibility); see also *Cansler v. State*, 234 Kan. 554, 566, 675 P.2d 57 (1984) (if sheriff's office repeatedly over time notified surrounding law enforcement agencies of penitentiary escape, duty to disseminate such information promptly may have been established). But such an undertaking is not accidental; it is a conscious commitment made through an affirmative action or an agreement entered into by the defendant. *P.W.*, 255 Kan. at 834; *Gooch*, 246 Kan. at 674-75.

The extent of the undertaking defines the scope of the duty that arises as a result. *McGee v. Chalfant*, 248 Kan. 434, 442, 806 P.2d 980 (1991) (defendants who assumed duty to take drunk driver to car assumed no further duty to transport him home or otherwise control his future actions). And the harm to the plaintiff or the plaintiff's property must be physical. See *Barber v. Williams*, 244 Kan. 318, 324, 767 P.2d 1284 (1989) (even if city's licensing of

fortune teller had constituted § 324A undertaking, plaintiff suffered no physical harm); *Cessna Aircraft Co. v. Metropolitan Topeka Airport Authority*, 23 Kan. App. 2d 1038, 1044-45, 940 P.2d 84 (1997) (physical damage to plaintiff's property sufficient).

Once an undertaking is found to be sufficient, we are required to consider the three subsections of § 324A. One must apply before a defendant will face potential liability.

Subsection (a) requires that the defendant's failure to exercise reasonable care must have increased the risk of harm to the plaintiff. See *Beshears v. U.S.D. No. 305*, 261 Kan. 555, 565, 930 P.2d 1376 (1997) (any alleged failures by school district to abide by policies regarding expulsion, student conflicts did not increase risk of harm); *Beebe v. Fraktman*, 22 Kan. App. 2d at 496 ("By Monday morning quarterback standards, SRS might have decreased the risk . . . had it opened a file and actively investigated; however, we cannot state that SRS's failure to do so increased the risk of harm.")

Subsection (b) requires that the defendant must have undertaken to perform a duty owed by another to the plaintiff. Compare *Gooch*, 246 Kan. at 676 (no duty where church to whom defendants rendered services had never surrendered any part of its obligation to maintain building; person to whom defendant's undertaking directed "must accept such services in lieu of, or in addition to, such person's obligation to perform services"), to *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 294-95, 672 P.2d 1038 (1983) (Kansas Turnpike Authority's duty to maintain turnpike safety included inspection duty passed on to defendant; defendant potentially liable to plaintiff injured because of unsafe turnpike bridge); *Chadwell v. Clements*, 18 Kan. App. 2d 84, 89-91, 847 P.2d 1344 (1993) (defendant employer assumed no duty of county to make crosswalk safe).

Subsection (c) requires that the harm suffered by the plaintiff must have been caused by the plaintiff's or the other's reliance on the defendant's undertaking. See *P.W.*, 255 Kan. at 833-34 (no evidence defendant made specific promise, representation to plaintiffs that would induce justifiable reliance); *Chadwell*, 18 Kan. App.

2d at 91 (plaintiff did not rely on presence of guard when using crosswalk).

Our exhaustive review of Kansas cases interpreting and applying § 324A persuades us that our courts have generally been slow to see an undertaking sufficient to create a duty. See *Prime v. Beta Gamma Chapter of Pi Kappa Alpha,* 273 Kan. 828, 842-43, 47 P.3d 402 (2002) (no undertaking by landlord to prevent fraternity member from consuming alcohol); *Glaser v. U.S.D. No. 253,* 271 Kan. 178, 191, 21 P.3d 573 (2001) (no school district undertaking to protect or supervise student hit by car when he ran off of school grounds before school); *Beshears,* 261 Kan. at 565 (school district had no duty to protect student from injuries suffered in fight after school off of school premises); *Calwell v. Hassan,* 260 Kan. 769, 783-84, 925 P.2d 422 (1996) (prescribing physician had no duty to warn patient of likelihood of drowsiness; no duty to cyclists injured when patient falls asleep at wheel); *Honeycutt v. City of Wichita,* 251 Kan. 451, 468, 836 P.2d 1128 (1992) (school district did not undertake to provide railroad crossing guard); *Anderson v. Scheffler,* 248 Kan. 736, 742, 811 P.2d 1125 (1991) (defendant who ordered component parts of conveyor system bore no responsibility for design); *Gooch,* 246 Kan. at 676 (inspecting engineers did not undertake to provide warning of unsafe building to neighbors); *Meyers v. Grubaugh,* 242 Kan. 716, 723, 750 P.2d 1031 (1988) (employer undertook no duty to keep drunk employee from driving home); *Hanna,* 233 Kan. at 222 (architecture firm undertook no duty for safety at jobsite); *Doss v. Manfredi,* 30 Kan. App. 2d 269, 271, 40 P.3d 333 (2002) (chiropractor hired by insurance company to review patient's file assumed no duty to patient); *Prugue v. Monley,* 29 Kan. App. 2d 635, 639, 28 P.3d 1046 (2001) (employment manual's prohibition of drinking on duty does not constitute employer undertaking to protect third parties from foreseeable risks created by bar manager's alcohol consumption); *Estate of Beckner v. Jensen,* 29 Kan. App. 2d 129, 136, 24 P.3d 169 (2001) (no affirmative act in allowing young man to attend post-prom party; hosts undertook no duty to prevent him from driving while tired); *Chadwell,* 18 Kan. App. 2d at 89-91 (employer assumed no duty to employee by cooperating with county on street crossings).

Kansas cases in which an undertaking sufficient to create a duty was recognized have been comparatively fewer and farther between than their analytical opposites. See *Reynolds v. Kansas Dept. of Transportation,* 273 Kan. 261, 266, 43 P.3d 799 (2002) (transportation agency had duty to maintain fences along highway); *Johnson v. Board of Pratt County Comm'rs,* 259 Kan. 305, 318, 913 P.2d 119 (1996) (designer of bridge for county owed duty to downstream landowner plaintiffs); *Smith v. Massey-Ferguson, Inc.,* 256 Kan. 90, 115, 883 P.2d 1120 (1994) (manager of father's farm operation had duty to employee injured in combine); *Fudge v. City of Kansas City,* 239 Kan. 369, 373, 720 P.2d 1093 (1986) (mandatory policy demanded police take drunk into protective custody to protect third persons); *Cessna Aircraft Co.,* 23 Kan. App. 2d at 1045 (approving district court employment of § 324A to hold lease gave rise to duty to provide lessee — and thus its sublessee — fire protection).

As certain of the citations above suggest, several Kansas decisions holding that no duty arose under § 324A have involved SRS and/or its employees as defendants.

The first of these cases, *P.W. v. Kansas Department of Social and Rehabilitation Services,* 255 Kan. 827, involved a licensed day care center. Plaintiffs' children were cared for at the center. SRS and the Kansas Department of Health and Environment had taken no action on several reports of abuse at the center. SRS also had not warned the plaintiffs about the allegations. Our Supreme Court held that the agencies had no duty to warn, stating simply:

"The plaintiffs have not come forward with any evidence to indicate . . . SRS [has] performed any affirmative acts towards these plaintiffs, nor have the plaintiffs demonstrated a question of fact exists as to whether . . . SRS entered into any agreement with these plaintiffs. Without an affirmative act or an agreement, there is no duty owed under § 324A." 255 Kan. at 834.

In *Beebe v. Fraktman,* 22 Kan. App. 2d at 493, a panel of this court examined whether SRS owed a § 324 duty to a child killed by her father. SRS' Wichita office had received two reports of suspected abuse and neglect. The first came from the child's maternal grandmother and the grandmother's counselor. SRS social workers reviewed the file, determined that the child was at minimal risk,

and did not open a case for investigation. The second report came from the child's pediatrician, who contacted SRS regarding possible sexual abuse when the child's father brought her in for treatment for vaginal bleeding. The pediatrician did not say that the bleeding was "conclusive" of abuse. Again, SRS employees reviewed the information submitted and decided not to open a case for investigation. Stressing that the grandmother was given no promise of an investigation and that the pediatrician was told only that someone would follow up on the report, the panel held that no undertaking occurred under § 324A. 22 Kan. App. 2d at 496.

In *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, another panel of this court refused to find that SRS undertook a duty to a teacher accused of child abuse merely because it investigated a student's complaint. Noting the investigation was required by law, the panel stated: "There is no evidence whatsoever that SRS performed any affirmative act to render services for [plaintiff] or entered into any agreement to do so." 23 Kan. App. 2d at 399. Citing *P.W.*, 255 Kan. 827, the panel said: "Since the law is clear that SRS owes no duty to abused children, it surely owes no duty to an alleged abuser. " 23 Kan. App. 2d at 398.

In *Kennedy v. Kansas Dept. of SRS*, 26 Kan. App. 2d 98, 981 P.2d 266, *rev. denied* 267 Kan. 889 (1999), another panel of this court rejected a § 324A claim from a later target of an SRS abuse investigation. The plaintiff had argued the agency's referral to the county attorney for criminal prosecution constituted an affirmative act. The panel said of the plaintiff: "He overlooks the Restatement's requirement that the defendant undertake to render service to the plaintiff . . . . If [the] recommendation created a special duty on this theory, the duty was to the alleged victim, not to the plaintiff." 26 Kan. App. 2d at 102.

Defendants Sramek and Keady also cite a case from the Kansas federal court, *A.S. By and Through Blalock v. Tellus*, 22 F. Supp. 2d 1217 (D. Kan. 1998). This decision has no bearing on the § 324A issue at hand. It analyzes only whether federal substantive or procedural due process claims can be based on an SRS failure to remove a child from an abusive adult's care. 22 F. Supp. 2d at 1222-23.

Our careful consideration of all this prior case law demonstrates that it is an overgeneralization to say SRS owes "no duty to abused children." The law is clear that SRS owes no *statutory* duty to investigate abuse and neglect reports to individuals. But neither *P.W.* nor any other Kansas case holds that SRS may not, through an affirmative act or agreement, undertake a § 324A *tort* duty to an individual.

Once Baby Roe was born, the only explicit or formal undertaking or agreement by SRS was its admitted commitment to monitor the services provided to the Tuthills for the benefit of Baby Roe. The various agency representatives and health care providers who attended the hospital meetings before Terri and Baby Roe were discharged may differ somewhat in their recitations regarding those events, but none dispute that SRS took on a coordinating or monitoring role, and the efforts of all were directed to seeing that the Tuthills received the support services they needed to protect Baby Roe. The district court therefore erred in holding that no § 324A duty arose.

Did the SRS duty also fit at least one of the three subsections of § 324A? We think the uncontroverted evidence is that it did. When parents are healthy, our culture and governmental system allocates to them the responsibility of caring for their children, including monitoring any part of the care they delegate to others for protection of the children. In this case, it was determined that Terri and Booth were not capable of bearing that responsibility without assistance. The assistance was to be provided by a team of agencies to be monitored by SRS. In this way, SRS undertook part of a duty owed by Terri and Booth to their child. Subsection (b) was satisfied.

SRS's duty also continued, at least impliedly, until the time of Baby Roe's injury. Sramek's instruction to Keady to follow up with BIA on Brown's late September report of Terri's abuse allegation is one fact demonstrating that all of the parties involved shared this understanding of SRS's role. Without such an understanding, there also would have been no reason for Brown and SRS to keep in contact about Terri's departure for her Osawatomie hospitalization and Booth's resulting caretaker responsibility for Baby Roe. As

Keady said herself, SRS was responsible for making sure that BIA and mental health personnel delivered the support services the family needed to "insure that [the baby] was safe."

We must again stress that this tort duty to Baby Roe was distinct from SRS's independent statutory duty to investigate reports of abuse and neglect. Precedent dictates that the statutory duty and any breach of it, no matter how obvious, cannot be relied upon by an abused child. To the extent that SRS deviated from its established policies for handling the late September abuse allegation or the early October neglect report, and those deviations constituted a breach of its statutory duty to the public, they are relevant in this case only to the extent that a party charged with the tort duty SRS undertook voluntarily should have acted differently than Keady and Sramek. In short, it is the *statutory* duty that SRS did not owe to Baby Roe individually. We hold here that, on these facts, it *did* owe him a *tort* duty. Under § 324A, SRS and its employees had to use reasonable care to monitor service delivery to the Tuthills to protect Baby Roe. SRS voluntarily and affirmatively undertook this obligation. Now, a jury must be permitted to decide the fact issues of whether defendants' conduct measured up to the § 324A standard and, if not, whether their failure was the proximate cause of Baby Roe's injury.

One more point merits brief mention: Defendants state in their brief that plaintiffs attempt to argue on appeal that SRS was negligent in selecting BIA to provide day-to-day services to the Tuthills. To the extent this is a correct characterization of plaintiffs' position on appeal, we agree that such a claim was not pursued before the district court. We will not address it for the first time on appeal. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003).

Reversed and remanded for trial.

MALONE, J., dissenting: I respectfully dissent. Based upon the record, I am unable to conclude that by agreeing to "monitor" this case, the Kansas Department of Social and Rehabilitation Services (SRS) "undertook to render services to another" sufficient to assume a duty under Restatement (Second) of Torts § 324A (1964).

The uncontroverted evidence establishes that no one seemed to want SRS to be involved in this case. Neither Terri Tuthill nor Booth Tuthill ever requested or desired assistance from SRS with regard to the upbringing, custody, or care of their son. In fact, they were quite insistent that SRS not be involved. Terri would not even open the door on the last two occasions Mary Keady tried to make a home visit.

After Baby Roe was born, there was a meeting between representatives of SRS, the county mental health center, and the Bureau of Indian Affairs (BIA). The representatives from BIA were quite adamant that SRS should "back off" because BIA had jurisdiction over the case. BIA agreed to make home visits and provide parenting education to the Tuthills. The mental health center also agreed to provide in-home services for the family. This was acceptable to the Tuthills.

At this point, SRS agreed to "monitor" the case. Keady testified:

"Q.: [Alright.] And what services were to be provided by SRS?
"A.: I don't believe any at that time other than monitoring it to make sure that . . . the Bureau of Indian Affairs was there and to keep in contact with the Mental Health Center."

Keady explained that if she deemed the services of BIA and the mental health center to be inadequate, she would meet with her supervisor and "go from there."

In its ruling, the district court essentially adopted the defendants' statement of uncontroverted facts. In addressing whether SRS owed a duty under § 324A, the district court stated:

"In order for plaintiff to have a submiss[i]ble case under 324A, there must be evidence ... that SRS through an affirmative act or agreement assumed an obligation to render services to the child's parents or intended to render services for the benefit of the child's parents and that the services rendered were more than a limited undertaking, that is, such that SRS recognized that they were necessary for the protection of the child. There is just no evidence here that SRS ever rendered any services to this child's parents of the quality or nature that is contemplated by §324A."

I agree with the district court. I think a fair characterization of SRS's role in this case is that SRS agreed it would be there for the Tuthills if needed. The Tuthills did accept services from BIA and

the county mental health center. The only evidence that SRS rendered services to the Tuthills was Keady's statement about monitoring the services. In my opinion, the monitoring of services by others does not rise to the level of assuming a § 324A duty and is incidental at best.

Although this is a frustrating case, given the unfortunate prognosis for a child whose injuries may have been prevented, the district court did not err in granting summary judgment as a matter of law in favor of defendants.