No. 89,462

ROBERT BOOTH ROE, a Minor Child By and Through his Adoptive Parents, RICHARD ROE and JANET ROE, and JENNIFER BRUNETTI, Conservator, *Appellants,* v. DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES FOR THE STATE OF KANSAS, THE STATE OF KANSAS, WAYNE SRAMEK, HERBERT HICKMAN, and MARY KEADY, *Appellees.*

(102 P.3d 396)

Opinion filed December 17, 2004.

*Robert S. Tomassi*, of Tomassi Law Firm, of Pittsburg, and *Richard D. Loffswold, Jr.*, of Girard, argued the cause and were on the briefs for appellants.

*C. William Ossmann*, chief litigation attorney, argued the cause and was on the briefs for appellees the State of Kansas and Kansas Department of Social and Rehabilitation Services.

*Matthew W. Boddington*, Legal Division, Kansas Department of Social and Rehabilitation Services, was on the briefs for appellee Wayne Sramek.

*Deborah June Purce*, of Law Office of Deborah June Purce, of Topeka, was on the briefs for appellee Mary Keady.

*L.J. Leatherman*, of Palmer, Leatherman & White, of Topeka, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

*Per Curiam*: Baby Roe was born to parents who lived in a residential mental health treatment facility. Because staff at the facility were concerned about the parents' ability to care for the baby, the Kansas Department of Social and Rehabilitation Services (SRS) and the Bureau of Indian Affairs (BIA) became involved. Baby Roe subsequently suffered severe and permanent injuries at the hands of his father despite ongoing monitoring of his family situation by SRS. Baby Roe, his adoptive parents, and his conservator sued SRS, the State, and individual case workers in tort. The district court granted summary judgment in favor of the defendants, and the plaintiffs appealed. In a split decision, the Court of Appeals reversed and remanded for trial, ruling that SRS voluntarily and affirmatively undertook a Restatement (Second) of Torts § 324A (1964) duty to monitor delivery of family support services for the care and protection of Baby Roe. This court granted the defendants' petitions for review.

### Facts

The Court of Appeals stated the facts as follows:

"Baby Roe was born to Terri and Booth Tuthill in Pittsburg on August 6, 1992. Medical personnel and employees of the Tuthills' residential facility had concerns regarding Baby Roe's parents even before his birth. Specifically, SRS was told by letter that Terri exhibited symptoms of psychosis and depression, that she and Booth abused drugs and alcohol, and that Booth physically abused Terri.

"Defendant Mary Keady (Keady), an SRS social worker, was assigned to the matter in June 1992. Keady kept some contemporaneous logs of her efforts regarding the Tuthills. However, her supervisor, defendant Wayne Sramek, permitted Keady to add to these logs after Baby Roe was injured.

"Keady attempted to meet with Terri three times before Terri delivered Baby Roe. At the first visit, Terri was 'very guarded and untrusting and did not want any part [of] SRS' help.' On the second and third occasions, Terri apparently refused to answer her door.

"The day after Baby Roe's birth, the Bureau of Indian Affairs (BIA) was notified, pursuant to the Indian Child Welfare Act, because both parents had Native American ancestry. Booth, in particular, was registered by the Quapaw tribe. The hospital launched meetings among nursing staff, psychiatric staff, SRS staff, and BIA staff that day because of its concerns about the Tuthills' ability to care for Baby Roe. The goal, in Keady's words, was to 'insure that [the baby] was safe' when he was discharged with his mother. According to notes taken by Terri's obstetrician:

'A meeting was held with nursing staff, psychiatric staff, SRS staff, and two staff persons from the [BIA], to make arrangements for very close home follow up for mother and baby. It was decided that the [BIA] would handle the home care follow up. Concerns were expressed regarding the welfare of the infant at this meeting. It was felt that the patient was exhibiting fairly good mothering instincts and it was hoped that with close home follow up the infant's status could be evaluated. All personnel were made aware of the potential problem and close home follow up is planned by Lisa Lucher [*sic*] of the [BIA].'

"A hospital social worker recorded the following regarding the discharge plan:

'[BIA's] Sally [Whitecrow-]Ollis, Director of Social Services, and Miss Lisa Luther, Child Protection Worker[,] . . . came to the hospital and did interview Terri and Booth and provided assessment for this couple concerning their follow up needs. Both Miss [Whitecrow-]Ollis and Miss Luther met with [hospital staff], concerning the needs of this couple. It was decided that Lisa would be the contact person for Terri and Booth and would provide daily supervision of their care of the infant. The couple met with the team and it was noted that Terri [was] quite anxious and overwhelmed by the number of people involved in working with her and request was made that she relate to one person, and that one person that she had chosen was Lisa Luther from the Indian Social Services Program. Lisa agreed to provide daily supervision and be accessible to Terri and Booth in caring for their son. Plans were for Terri and the infant to remain in the hospital during the weekend to provide further instruction to her in the care of the infant with plans for her and the baby's discharge on Monday morning, August 10th. Lisa will be at the hospital Monday morning and accompany the couple home from the hospital.'

"Luther testified about one of the meetings with hospital staff as follows:
'A. [Luther]: I came to work on the morning of August 7th, 1992, and was told by my supervisor that we were going to Pittsburg, and so we went to Pittsburg.

'Q. [Mr. Tomassi]: Your supervisor was Sally Ollis?

'A. Right. And we went to Pittsburg and met with—there was a worker there, but I can not [*sic*] recall whether it was from—I know it says the mental health workers, but I can not [*sic*] recall whether they—who it was, whether they were from Kansas SRS, or the mental health community, or who they were.

'Q. Would you remember any name?

'A. No.

'Q. Okay. And what was discussed?

. . . .

'A. From what I can remember the discussion was between Sally Whitecrow-Ollis and the worker—workers. I believe there were two of them. And the discussion was mainly over jurisdiction, who had jurisdiction on the case.

'Q. All right. Do you recall what was said?

'A. Yes. Sally was stating that we had jurisdiction. The workers were trying to immediately pull the child from—or terminate Booth and Terry's [*sic*] parental rights, and Sally was stating that they did not—they had no jurisdiction, that we had jurisdiction, you know, because we administered the social services for the Quapaw tribe at the time. And there was some discussion back and forth and it was determined the workers just, I guess, backed off, just said okay, you guys have jurisdiction.'

"Whitecrow-Ollis' memory of these events was that Keady wanted BIA to take 'complete charge' of the Tuthill case, but that was not 'an option.' According to Whitecrow-Ollis, BIA agreed to provide parenting education to Terri; SRS did not ask BIA to investigate child abuse reports and did not expect it to pursue such investigations. Whitecrow-Ollis testified that she did not think BIA was capable of providing full-time services, and the plan was that BIA workers would visit the Tuthills only 'once or twice a week and assist in teaching [Terri] whatever it was, trying to keep her calm.'

"Defendants admit that SRS's role was to monitor the services to be provided to the Tuthills after discharge. According to Keady, this monitoring was to include making sure that BIA was providing services and maintaining contact with the mental health center, *i.e.*, to make sure these entities were following through with planned visits and assistance. She stated that her understanding was that BIA would visit the Tuthills for several hours at least twice a week. She testified she did not know what services were to be provided by mental health workers. Finally, Keady also testified that her role, if she deemed BIA and mental health services to be inadequate, would require her to consult with Sramek and 'go from there.' Sramek testified that, although it would have been general practice and 'possibly would have been appropriate' for SRS to prepare a family services plan for the Tuthills, this was never done. Such a plan would have defined precisely what each agency committed to providing for the family.

"Upon discharge from the hospital, Terri and Booth took Baby Roe home to the Oak Place Residential Facility for the mentally ill in Pittsburg. Baby Roe had scored 8 and 9 out of 10 on APGAR birth assessments, and he went home in

'good' condition. Health care workers at the residential facility also had documented a care plan. They noted that BIA 'agreed to place a worker in the home 8am-5pm[,] Mon[day] thru Fri[day] to help teach Terri how to take care of the baby.' They also noted BIA had jurisdiction to determine whether Baby Roe should be placed outside of the family.

"Luther conducted at least some of the anticipated home visits to Terri and Baby Roe. She described Terri as lacking 'basic parenting skills' and said the same of Booth. Luther did not recall ever meeting with SRS or giving SRS staff written reports about her visits to the Tuthill home. She also did not recall receiving information about Terri or Booth from SRS. She remembered only that Ollis told her Terri was 'mildly psychotic' and Booth was 'mildly retarded.' Luther soon left her position as a BIA child protection worker.

"Community mental health worker Jeanne Brown testified in her deposition that BIA workers never spent full weekdays with Terri and Baby Roe. By August 17, Luther had been replaced by BIA worker Linda Turner Smith, and Smith reported that her initial relationship with Terri on that date was 'uneasy' because there already had been a lapse of services since Luther's departure. In addition, Whitecrow-Ollis testified that eventually Terri would no longer let Smith into the Tuthill home. Whitecrow-Ollis said she was sure BIA reported this development to SRS as well as mental health workers. Keady testified that she was told as early as August 18 that mental health staff were having trouble getting access to the Tuthill home. This concerned her, she said, because it made monitoring impossible.

"On September 24, 1992, Brown documented a conversation with Terri in which Terri stated she was afraid that Booth would hurt Baby Roe by shaking him too hard and that Terri would be unable to stop him. This was reported to SRS child protection services.

"On September 25, 1992, Sramek told Keady about Booth's alleged abuse of Baby Roe. Sramek did not believe the report was 'valid,' but instructed Keady to 'coordinate with [BIA].' He 'wanted [BIA workers] to know that [Terri] was making this allegation . . . because [BIA was] one of the primary service providers . . . in case they saw any evidence they could report it . . . so they could look for evidence, if necessary.' Sramek nevertheless personally believed that the baby was safe. He said he formed his opinion because of what he understood to be Brown's belief, although he could not recall whether he or Keady or an SRS child protection worker had talked to Brown about the report.

"No one from SRS ever visited personally with the Tuthills to follow up on the Brown abuse report, although Brown had agreed to go with an SRS worker to visit the family. Sramek said no one visited because it was determined that the report was not to be believed. This was not the normal SRS procedure, as this passage from Sramek's deposition demonstrates:

'Q. [W]hat would you generally do if you had allegations of a father shaking a two-month old infant, what would you normally do?

'A. Assign it for investigation. .

'Q. And did you do that in this case?

'A. No.

'Q. And you knew the mother had mental illness?

'A. Yes.

'Q. And so you know her allegation could have been true or not true?

'A. Yes.

'Q. And you know that the baby could have been in danger just because of the mother's mental illness, is that right?

'A. Yes.

'Q. And you still didn't assign it for investigation?

'A. Because the mandated reporter did not believe the abuse was occurring.

'Q. And if she disagrees with you on that statement, then you've made a serious mistake, haven't you?

'A. Yes.'

"According to Sramek, Brown was never sent a Notice of Action, which is the form SRS uses to let a mandatory reporter know what was done by the agency in response to an allegation of abuse or neglect. In Sramek's words, Terri's allegation about Booth shaking Baby Roe 'went outside of [SRS's] normal practice. [The] report was neither screened out nor screened in, but was passed on to Mary Keady.' Keady said in her deposition that she never investigated personally because it would have been an SRS child protection worker's responsibility to do so rather than hers.

"Keady testified that she did call BIA, but its office was closed. Although she said that she tracked down a BIA secretary at home, apparently she was told that no one but Whitecrow-Ollis or Smith was acquainted with the family's situation. Whitecrow-Ollis testified she did not recall receiving a telephone call from Keady about the Brown report, and Smith denied ever hearing about the September allegation that Booth had shaken Baby Roe. Keady's logs reflect that she finally had a conversation with Whitecrow-Ollis on September 30 but not that she discussed whether BIA had investigated or would investigate the abuse allegation.

"Keady also testified that she called Brown and discussed Terri's abuse allegation. Brown recalled no such conversation and said she would not have minimized the report of Booth's behavior and would not have told SRS that Terri was mentally ill and on medication because it would have been irrelevant. Brown also said she would not have said she did not believe Terri.

"On October 7, Keady learned that Brown had contacted SRS again because Terri had left Baby Roe alone. Terri had to be hospitalized in Osawatomie, and Baby Roe was left in the care of his father and a sitter. Keady and Sramek asserted that Brown said she thought Baby Roe's father was doing a good job, but Brown denied ever telling anyone at SRS that the situation was safe. SRS did nothing to follow up on the report of neglect by Terri or to check on how Baby Roe was faring in the care of his father.

"On October 12, 1992, Baby Roe was life flighted to Kansas University Medical Center. He was in respiratory distress and had a 'skull fracture, subarachnoid

hematoma (bleeding between skull and brain), and . . . (retinal hemorrhages).' He had also had seizures and had required mechanical ventilation.

"Booth was convicted of attempted abuse of a child. Terri has since died. Baby Roe is 'now permanently and profoundly mentally retarded.' His prognosis suggests that he 'will never be able to dress himself or to be toilet trained.' " *Roe v. Kansas Dept. of SRS*, 32 Kan. App. 2d 158, 160-66, 80 P.3d 1162 (2003).

Baby Roe, his adoptive parents, and his conservator sued SRS, the State, Keady, and Sramek alleging that the defendants breached a legal duty arising pursuant to § 324A of the Restatement (Second) of Torts. The district court granted summary judgment in favor of the defendants, concluding that they owed no legal duty to Baby Roe under § 324A because the plaintiffs had produced no evidence that the defendants undertook to render services to Baby Roe's parents which they should have recognized as necessary for the protection of Baby Roe.

The plaintiffs timely appealed. In a split decision authored by now Justice Beier and joined by Judge Knudson, the Court of Appeals reversed and remanded for trial, holding that on the facts of the case, "SRS voluntarily and affirmatively undertook a Restatement (Second) of Torts § 324A duty to monitor delivery of family support services for the care and protection of the plaintiff child." 32 Kan. App. 2d 158, Syl. ¶ 12. Judge Malone dissented, stating:

"I agree with the district court. I think a fair characterization of SRS's role in this case is that SRS agreed it would be there for the Tuthills if needed. The Tuthills did accept services from BIA and the county mental health center. The only evidence that SRS rendered services to the Tuthills was Keady's statement about monitoring the services. In my opinion, the monitoring of services by others does not rise to the level of assuming a § 324A duty and is incidental at best." 32 Kan. App. 2d at 176-77.

Defendant SRS and defendants Keady and Sramek filed separate petitions for review, both of which were granted by this court.

In its petition for review, SRS seeks review of four issues: (1) whether SRS owed a legal duty to Baby Roe under § 324A as found by the Court of Appeals; (2) whether the public duty doctrine applies to protect SRS from liability; (3) whether sovereign immunity applies to protect SRS from liability; and (4) whether the exceptions to liability under the Kansas Tort Claims Act (KTCA), K.S.A.

75-6101 *et seq.*, apply to protect SRS from liability. SRS claims that the last three issues were not addressed by the Court of Appeals.

Keady and Sramek also argue that the Court of Appeals erred in finding that SRS owed a legal duty under § 324A. Additionally, Keady and Sramek contend that the court erred in reversing the district court's grant of summary judgment as to them individually when the court found only that SRS and the State of Kansas had a legal duty to the plaintiff.

In their response to the defendants' petitions for review, the plaintiffs, joined by the amicus Kansas Trial Lawyers Association, argue that the Court of Appeals majority was correct; the plaintiffs also seek review of an issue they claim was not decided by the Court of Appeals, *i.e.*, whether the defendants were liable for negligently selecting BIA to provide protective services for Baby Roe. The Court of Appeals declined to consider this issue, finding it was not presented to the district court. 32 Kan. App. 2d at 175. Plaintiffs now claim they did present the issue to the district court, pointing out that the issue was set forth in the pretrial order. While the plaintiffs did raise the issue, their argument goes to whether the defendants were negligent and breached a duty, not whether they owed a duty to Baby Roe. The district court addressed only whether the defendants owed a duty to Baby Roe and found they did not.

The rules regarding appellate review of summary judgment are well known:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

The core issue in this case is whether an SRS case worker's promise to monitor the delivery of services by BIA and a mental health center constitutes an undertaking sufficient to meet the threshold requirement for imposing liability under § 324A of the Restatement (Second) of Torts. In Kansas, a plaintiff in a negligence action must first prove the existence of a duty owed to him or her by the defendant. The existence of a duty is a question of law, and our review of questions of law is unlimited. *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 831, 877 P.2d 430 (1994).

Restatement (Second) of Torts § 324A provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

The Court of Appeals found that SRS undertook to monitor or coordinate support services necessary to protect Baby Roe, thus the district court erred in holding that no § 324A duty arose. 32 Kan. App. 2d at 174. The Court of Appeals also found that subsection (b) of § 324A was satisfied because SRS undertook part of a duty owed to Baby Roe by his parents, who were not capable of bearing that responsibility without assistance. 32 Kan. App. 2d at 174.

SRS argues that the Court of Appeals' conclusion is at odds with this court's decision in *P.W.*, 255 Kan. 827, and subsequent case law limiting SRS's liability for negligence.

In *P.W.*, the parents of children who were abused in a daycare center sued SRS and the Kansas Department of Health and Environment (KDHE) alleging they were negligent in failing to revoke the daycare center's license and in failing to warn the plaintiffs about reports of abuse. This court found there was no evidence indicating that SRS or KDHE had performed any affirmative acts

toward the plaintiffs or entered into any agreement with the plaintiffs, thus there was no duty owed under § 324A. 255 Kan. at 834. Although SRS had investigated reports of abuse at the daycare center, the statutory duty requiring SRS to investigate was "a duty towards the public at large. Under the public duty doctrine, 'a governmental entity is not liable for torts committed against a person in absence of a special duty owed to the injured party.' [Citation omitted.]" 255 Kan. at 835.

In *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 921 P.2d 216 (1996), the plaintiffs claimed SRS was negligent in its investigation of child abuse allegations and, as a result, a child was killed by her father. The Court of Appeals ruled that "[t]he mere taking of a report regarding possible child abuse and the assurance to follow up on that report does not constitute an undertaking to render specific services sufficient to create a legal duty on the part of SRS and its employees." 22 Kan. App. 2d 493, Syl. ¶ 1. The court explained that any promise to follow up was merely a promise to comply with SRS's statutory duty, a duty which *P.W.* held was owed only to the public at large. 22 Kan. App. 2d at 496. The court also ruled that the decision whether to open a file for further investigation was a discretionary function, thus SRS was immune from liability under the KTCA. 22 Kan. App. 2d at 496.

In *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, 931 P.2d 26 (1997), an alleged child abuser sued SRS for negligence and malicious prosecution. The Court of Appeals ruled that SRS owed no duty to the alleged abuser during its investigation of him because any duty was owed to the public at large. 23 Kan. App. 2d at 398. The court found *P.W.* to be controlling and ruled that SRS had no § 324A duty where there was no evidence that SRS performed any affirmative act to render services for the alleged abuser or entered into any agreement to do so. 23 Kan. App. 2d at 398-99. The court also concluded that conducting an investigation of alleged child abuse is a discretionary function entitled to immunity pursuant to K.S.A. 75-6104(e) of the KTCA. 23 Kan. App. 2d at 402-03.

The Court of Appeals revisited the issue of SRS liability for investigating alleged child abusers in *Kennedy v. Kansas Dept. of*

*SRS*, 26 Kan. App. 2d 98, 981 P.2d 266, *rev. denied* 267 Kan. 889 (1999). There, the court ruled that an SRS employee's recommendation that the county attorney file charges against an alleged child abuser did not constitute an "affirmative act" creating a special duty to the alleged abuser. 26 Kan. App. 2d at 102.

We agree with SRS's argument that these cases foreclose a finding of a duty owed specifically to Baby Roe because the duty SRS undertook was part of its public, statutory duty. K.S.A. 38-1524 applies "[w]hen a report . . . indicates that a child may be harmed" and states that SRS "shall make a preliminary inquiry to determine whether the interests of the child require further action be taken. . . . If reasonable grounds to believe abuse or neglect exist, immediate steps shall be taken to protect the health and welfare of the abused or neglected child . . . ." The statute provides that a child in need of care petition will be filed only after SRS "determines it is not possible to provide otherwise those services necessary to protect the interests of the child." This language is sufficiently broad to cover the nature of the actions undertaken in this case. Monitoring the delivery of services by BIA and the mental health center was a step taken to protect the health and welfare of Baby Roe.

Furthermore, we find that SRS's agreement to monitor services was only a limited or incidental undertaking which did not give rise to a § 324A duty. In *Estate of Beckner v. Jensen*, 29 Kan. App. 2d 129, 24 P.3d 169 (2001), the defendants allowed their son to host a post-prom party in their home. One of the young men who attended the party stayed up most of the night and upon driving home struck and killed a bicyclist. The Court of Appeals ruled that the defendants had not taken affirmative action toward the tortfeasor and any action on their part was so limited that it did not establish a duty under § 324A. 29 Kan. App. 2d at 136.

In so ruling, the court discussed another limited undertaking case, *McGee v. Chalfant*, 248 Kan. 434, 806 P.2d 980 (1991). In *McGee*, this court held that the defendants had no § 324A duty where they merely agreed to take the tortfeasor to his car, noting that the extent of a Restatement (Second) of Torts § 324A undertaking defines the scope of the duty that arises as a result. 248 Kan.

at 442. Although they knew the tortfeasor was intoxicated, the defendants had undertaken no duty to prevent him from driving. 248 Kan. at 442.

In this case, SRS undertook to monitor services to be provided by BIA and the county mental health center. An undertaking to monitor services to be provided by another is more limited than an undertaking to provide those services directly and certainly was not an undertaking to prevent the abuse of Baby Roe. Therefore, the undertaking was so limited that it did not give rise to a § 324A duty.

The same analysis applies to Kready and Sramek acting as employees of SRS.

Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

BEIER, J., not participating.

LARSON, S.J., assigned.

LUCKERT, J., dissenting: I disagree with the conclusion of the majority and would find that the Kansas Department of Social and Rehabilitation Services (SRS) voluntarily and affirmatively undertook to monitor the delivery of family support services for the care and protection of Baby Roe and as such owes a duty pursuant to Restatement (Second) of Torts § 324A (1964).

None of the cases cited by the majority regarding SRS's public duty foreclosed the possibility that SRS might be liable if it did undertake an affirmative act toward a plaintiff other than the performance of a statutory duty or discretionary function. See *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 831, 877 P.2d 430 (1994); *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, 931 P.2d 26 (1997); *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 921 P.2d 216 (1996). In fact, in *P.W.*, the court noted that a public duty "may be narrowed into a special duty owed to an individual where the governmental entity has performed some affirmative act that

causes injury or where it had made a specific promise or representation that under the circumstances creates a justifiable reliance on the part of the person injured." 255 Kan. at 835.

I agree with the Court of Appeals majority which distinguished the above authorities by stressing that the § 324A tort duty

"was distinct from SRS's independent statutory duty to investigate reports of abuse and neglect. Precedent dictates that the statutory duty and any breach of it, no matter how obvious, cannot be relied upon by an abused child. To the extent that SRS deviated from its established policies for handling the late September abuse allegation or the early October neglect report and those deviations constituted a breach of its statutory duty to the public, they are relevant in this case only to the extent that a party charged with the tort duty SRS undertook voluntarily should have acted differently than Keady and Sramek. In short, it is the *statutory* duty that SRS did not owe to Baby Roe individually. We hold here, on these facts, it *did* owe him a *tort* duty. Under § 324A, SRS and its employees had to use reasonable care to monitor service delivery to the Tuthills to protect Baby Roe. SRS voluntarily and affirmatively undertook this obligation. Now, a jury must be permitted to decide the fact issues of whether defendants' conduct measured up to the § 324A standard and, if not, whether their failure was the proximate cause of Baby Roe's injury." 32 Kan. App. 2d at 175.

In this case, SRS agreed to undertake a specific function which even it admits was not typical. While K.S.A. 38-1524 addresses the delivery of services by SRS, it does not impose a statutory duty for SRS to monitor other service providers who are providing direct services to the child or his or her family. Therefore, we are not dealing with a statutory duty owed to the public. Further, the undertaking was specifically for the benefit of Baby Roe, not children in general. Under such circumstances I would find a duty pursuant to § 324A of the Restatement (Second) of Torts.

Further, I dissent from the majority's conclusion that the undertaking was so limited it did not give rise to a duty. In essence, it appears the majority is making a decision of fact regarding causation; in other words the majority is impliedly stating that the duty to monitor is a different duty than ensuring safety and even good monitoring would not guarantee safety. This disregards the fact that SRS undertook a duty to monitor. Questions of fact exist as to whether SRS breached that duty and whether the breach resulted

in harm to Baby Roe. Those questions are not appropriate for summary judgment.

DAVIS and GERNON, JJ., join in the foregoing dissent.