NOT DESIGNATED FOR PUBLICATION

No. 122,662

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FRANKLIN JAMES OSBORN, as Heir at Law of A.O., and Administrator of the Estate of
A.O.,
*Appellant*,

v.

KANSAS DEPARTMENT FOR CHILDREN AND FAMILIES; LAURA HOWARD, in Her
Official Capacity as Secretary of DCF; KVC HEALTH SYSTEMS, INC. D/B/A KVC
BEHAVIORAL HEALTHCARE, INC.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Bourbon District Court; MARK ALAN WARD, judge. Opinion filed May 13, 2022.
Affirmed in part, reversed in part, and remanded with directions.

*Michaela Shelton*, of Shelton Law office, P.A., of Overland Park, for appellant.

*Corliss S. Lawson*, for appellees Department for Children and Families and Laura Howard in her
official capacity as Secretary.

*Heather Hatley*, *John G. Schultz*, and *Derek G. Johannsen*, of Franke Schultz & Mullen, P.C., of
Kansas City, Missouri, for appellee KVC Behavioral Healthcare, Inc.

Before ATCHESON, P.J., HILL and CLINE, JJ.

HILL, J.:  This is an appeal of the dismissal of a civil action against the Kansas
Department for Children and Families and its contractor, KVC Health Systems, Inc. d/b/a
KVC Behavioral Healthcare, Inc. The plaintiff is the father of a young boy who was

1

abused and then murdered by a man who was living with the boy's mother. Father claims the state agency and its contractor failed to take reasonable steps to protect his son after they had received reports of the abuse and neglect of his son and seeks damages in this tort action.

The district court dismissed the claims against DCF after finding that it was immune from suit and that DCF owed no special duty to the boy. The court dismissed the claims against KVC, ruling the claims were barred by the statute of limitations. Father appeals, raising three errors related to the ruling about DCF, and three issues on the court's ruling about KVC.

*This lawsuit was dismissed and then returned to district court after a successful appeal.*

In 2015, DCF received reports that six-month-old A.O. was being abused. Later, he was killed by his mother's boyfriend, Anthony Anderson. A.O. died on April 28, 2015. Anderson is now serving a life sentence for the child's murder. *State v. Anderson*, 308 Kan. 1251, 1252-53, 427 P.3d 847 (2018).

On April 25, 2017, Franklin James Osborn, A.O.'s father, sued Anderson, A.O.'s mother, DCF, and the secretary of DCF for wrongful death. Osborn alleged that DCF had received two hotline reports of neglect and abuse of A.O. He contended that DCF had then conducted a preliminary inquiry, opened a file, commenced an active investigation into the reports, and sought to render services to A.O. By doing so, Osborn argued that DCF had a special duty to protect A.O., but that DCF acted unreasonably by allowing A.O. to continue to live with Anderson, thus creating an unjustifiable risk that A.O. would be harmed. After filing his lawsuit, Osborn served DCF with a discovery request about its investigation of the alleged abuse.

2

In response, DCF admitted that it had received "one 'hotline' report of alleged abuse/neglect regarding A.O. on February 27, 2015 and a subsequent report on March 2, 2015." DCF moved to dismiss the lawsuit, contending that Osborn lacked standing to sue for wrongful death because he was not A.O.'s biological father. The district court agreed and dismissed the case. This court reversed, finding that Osborn was A.O.'s legal father and had standing to sue. *Osborn v. Anderson*, 56 Kan. App. 2d 449, 460, 431 P.3d 875 (2018).

The case returned to district court in early 2019, and discovery began. In July 2019, Osborn amended his petition to add factual allegations based on records that DCF had produced. In August 2019, Osborn filed a second amended petition and added a claim against a new party, KVC—DCF's contractor.

Because we are reviewing a dismissal on the pleadings, we offer some details found in the pleadings. In his second amended petition, Osborn brought a wrongful death claim against DCF on theories of negligence and negligent supervision of KVC and what he called "a survival action as third-party beneficiary against KVC for breach of contract." Osborn alleged that DCF had:

- Received five hotline calls from different individuals reporting A.O. was being physically abused and neglected by A.O.'s mother and Anderson;
- opened a case file;
- investigated;
- determined services were necessary to keep A.O. safe;
- referred A.O.'s case to KVC for services;
- created a written case plan to keep A.O. safe;
- identified Anderson as an immediate risk to A.O.'s safety;
- knew that Anderson was named as a perpetrator of child abuse against another young child;

- knew that Anderson was a cause of domestic violence in the home;
- knew that A.O.'s mother was only 17 years old and had a history of mental health issues;
- knew that A.O.'s mother had not complied with the written case plan;
- assigned an unqualified KVC employee to the case; and
- failed to protect A.O.

Osborn also alleged that KVC breached its written contract with DCF to provide services to children and families referred to KVC from DCF.

Both defendants sought a dismissal of the lawsuit on the pleadings. DCF claimed it owed no legal duty to A.O. and also claimed immunity based on the discretionary function exception to the Kansas Tort Claims Act. KVC claimed Osborn's cause of action against it was barred by the 2-year statute of limitations because his claims sounded in tort rather than contract law. The court granted both motions and Osborn appeals.

*The nature of the district court's ruling—granting judgment on the pleadings—is significant and affects our ruling.*

The statute, K.S.A. 2020 Supp. 60-212(b)(6), requires us to examine the issues here in a unique way. Since we are reviewing a judgment entered only on the pleadings, we will review all factual allegations in those pleadings in a light most favorable to Osborn. We will assume those facts are true, as well as any inferences we may draw from them. If those facts and inferences state *any claim* upon which relief can be granted, then we will rule the court's dismissal of the petition was improper. The rule is clear—at this point, dismissal of the lawsuit is proper *only when the allegations in the petition demonstrate the plaintiff does not have a claim.* See *Steckline Communications, Inc. v. Journal Broadcast Group of Kansas, Inc.*, 305 Kan. 761, 767-68, 388 P.3d 84 (2017).

After first reviewing some fundamental legal principles found in the Tort Claims Act, we will examine the three issues concerning DCF. After that, we will look into the issues about KVC. But we begin with the three questions we must answer about the claims against DCF:

- Did the district court err by ruling DCF was immune from liability because of the discretionary function of the Kansas Tort Claims Act?
- Did the district court err when it ruled that DCF owed A.O. a public duty and not a special duty?
- Did the district court err when it held that DCF was immune from liability for any negligent supervision of KVC?

*According to the Kansas Tort Claims Act, discretionary acts of government officials and State agencies are immune from civil liability. Ministerial acts are not.*

The Kansas Tort Claims Act allows individuals to sue governmental entities for the negligent or wrongful acts of their employees. Under the Act, governmental liability is the rule and immunity is the exception. A government entity is liable if a private person could be liable under the same circumstances and no statutory exception to liability applies. The government entity has the burden to establish an exception applies. *Patterson v. Cowley County*, 307 Kan. 616, 630, 413 P.3d 432 (2018). This means DCF must show it is immune to the claims here.

But there are exceptions to liability recognized in the Act. One such exception is the discretionary function exception. Under K.S.A. 75-6104(e), a governmental entity is not liable for damages resulting from "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless

5

of the level of discretion involved."

The Act does not define "discretionary function or duty." So courts have looked to "the nature and quality of the discretion exercised to determine whether a function or duty is discretionary." *Montgomery v. Saleh*, 311 Kan. 649, 664, 466 P.3d 902 (2020). Not every exercise of judgment qualifies for immunity. After all, some exercise of judgment is involved in every case. But the more a judgment involves policymaking, the more it is of a nature and quality inappropriate for judicial review. 311 Kan. at 664.

Such discretionary acts tend to require expertise, whether educational or from experience. *Williams v. C-U-Out Bail Bonds, LLC*, 310 Kan. 775, 795, 450 P.3d 330 (2019). Discretion implies the exercise of discriminating judgment within the bounds of reason. It involves the choice of exercising of the will, of determination made between competing and sometimes conflicting considerations. *Bolyard v. Kansas Dept. of Social & Rehabilitation Services*, 259 Kan. 447, 452, 912 P.2d 729 (1996). In contrast, ministerial acts do not involve particular skill or training. *Williams*, 310 Kan. at 795.

When a defined mandatory duty exists, the discretionary function exception does not apply. "Such duty may arise from agency directive, caselaw, or statute." *Saleh*, 311 Kan. at 664-65. A government agency is not immune from liability for violating a defined legal duty. A defined mandatory duty leaves little room for individual decision making, exercise of judgment, or use of skill. *Henderson v. Montgomery Cty. Bd. of Commissioners*, 57 Kan. App. 2d 818, 830, 835, 461 P.3d 64, *rev. denied* 312 Kan. 891 (2020).

Further, once the government agency has decided to undertake a voluntary task, the agency is not immune for negligence in carrying out a ministerial act in furtherance of the task. Negligent performance of a ministerial act is not protected by the discretionary

function exception. *Nero v. Kansas State University*, 253 Kan. 567, 585-87, 861 P.2d 768 (1993).

We must mention two other aspects of this rule. First, a defined duty may be a common law duty undertaken by the government actor. In *Williams*, citing Restatement (Second) of Torts § 323 (1965), the court held that because police had undertaken a duty to render services to the plaintiffs, their decision to discontinue an investigation of a bail bondsman's potentially illegal conduct was not protected by the discretionary function exception. 310 Kan. at 798-99. Once they decided to act, the police were liable if they then acted negligently.

And second, a government actor is not immune for negligence in carrying out a ministerial act in furtherance of a discretionary task. In *Allen v. Kansas Dep't of Soc. & Rehab. Servs.*, 240 Kan. 620, 622-23, 731 P.2d 314 (1987), the court held that while the decision of SRS to clean up a hallway outside its leased premises fit within the discretionary function exception because SRS had no legal obligation to do so, the actual physical cleanup of the hallway was a purely ministerial act not within the discretionary function exception. The cleanup of vomit on a floor is "about as ministerial as an act can be." 240 Kan. at 623.

With these rules in mind, we turn to the acts we must review in this case.

*Decisions made by State officials about the custody and placement of children are discretionary acts, not ministerial acts. They are, thus, immune from civil liability under the law.*

Court decisions have generally held that state officials' decisions about the custody of children are usually discretionary acts and not ministerial. In *Bolyard*, the court held the temporary placement of children with their mother was a discretionary decision and

7

SRS was immune from liability for negligence. The court pointed out the complexity of such judgments:

> "In caring for children within its custody, the government and its agents are continually called upon to make delicate and complex judgments, often involving weighing and balancing individualized risks . . . . 'Decisions of this nature rank high in the continuum of discretion and should not be subject to hindsight scrutiny by courts and juries.'
>
>     . . . .
>
> "The means by which placements are monitored and the people to whom social workers converse in supervising placements are not subject to any carefully drawn, precise legal standard, but involve discriminating judgment between competing interests and are clearly beyond the nature and character of acts the legislature intended to be subject to judicial review. [Citation omitted.]" 259 Kan. at 454-56.

Earlier, in *Gloria G. v. State Dept. of Social & Rehabilitation Services*, 251 Kan. 179, 190-92, 833 P.2d 979 (1992), the court held SRS was immune from liability for its removal of a child from a foster home upon suspicion of sexual abuse because the removal of the child was a discretionary act. But the court speculated that SRS could be subject to liability for the failure to remove the child from foster care if it had not done so:

> "The actions of SRS were of the discretionary nature that the legislature intended to put beyond judicial review. No specific guidelines exist to determine the proper course of action after a finding of sexual manipulation or abuse. A credible argument could be advanced that the *failure* to remove A. after notice of the sexual manipulation incident might subject SRS to suit for later untoward developments in A.'s personality." 251 Kan. at 191.

Then, in another case involving the death of a child, *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 494, 921 P.2d 216 (1996), the SRS had received two reports of suspected

abuse and neglect of a child by her father. SRS said it would follow up. After reviewing the reports SRS decided not to open a case for investigation. The child remained in the custody of her father. The child later died, and her father was convicted of her murder. The court held the decision whether to open a file for further investigation is a discretionary function. 22 Kan. App. 2d at 496.

After that, in *Burney v. Kansas Dept. of Social & Rehabilitation Services*, 23 Kan. App. 2d 394, 402-03, 931 P.2d 26 (1997), a substitute teacher sued after SRS wrongly determined that the teacher had committed aggravated sexual battery against a child. This court held the manner of investigating a charge of child abuse is a discretionary function and SRS was immune from liability for its failure to conduct a proper investigation. "If there was any fault or negligence on the part of SRS in conducting the investigation into the allegations of child abuse in this case, no liability could be predicated on that fault." 23 Kan. App. 2d at 403. See also *Kennedy v. Kansas Dept. of Social & Rehabilitation Service*, 26 Kan. App. 2d 98, 102, 981 P.2d 266 (1999).

In all of these cases the state agency was ruled immune because of the discretionary function exception to tort liability. But none of those cases we have listed were dismissals on the pleadings. Frankly, a dismissal on the pleadings may be premature. In *Watters v. Kansas Dep't for Children & Families*, No. 112,415, 2015 WL 9456744 (Kan. App. 2015) (unpublished opinion), the court faced facts much like what is alleged here. DCF had received reports that a child was being abused but allowed the child to remain with her mother. The child died after entering the hospital with bleeding in her brain, methamphetamine in her system, missing teeth, and bruises. The child's father sued DCF for failure to investigate reports of abuse and failure to remove the child from the mother's custody. The district court granted DCF's motion to dismiss on the pleadings. A panel of this court recognized that "a child-abuse investigation as a whole requires a series of discretionary decisions; it is more than just deciding to investigate and then investigating. See K.S.A. 2014 Supp. 38-2230. The investigation itself involves

discretion in a way that mopping a floor does not." 2015 WL 9456744, at *11. But the panel reversed the dismissal to allow the plaintiff to conduct discovery. 2015 WL 9456744, at *12.

But, unlike *Watters,* there has been some discovery here, though discovery was not completed. Osborn amended his petition to include information he learned through discovery.

Osborn contends DCF is not immune because its performance of protective services under its written case plan was ministerial, not discretionary, in nature. He argues that, while the decision to provide protective services to A.O. was discretionary, once that decision and a written case plan were made, the provision of protective services was purely ministerial. Thus, the agency and its employees had to act in a nonnegligent manner. He argues that DCF acted outside its statutory responsibilities by allowing A.O. to remain with his mother after she had violated DCF's written plan.

DCF contends that investigations of alleged child abuse and decisions whether to remove a child from an abusive home are not purely ministerial.

The application of a particular statute resolves this dispute. K.S.A. 2020 Supp. 38-2230 provides that DCF shall investigate reports of child abuse and "[i]f reasonable grounds to believe abuse or neglect exist, immediate steps shall be taken to protect the health and welfare of the abused or neglected child." To perform the duty "to take steps" established by this law, several questions must be answered by the state agency and its employees. What are *reasonable* grounds? Are *immediate* steps called for? Will these steps protect an abused or neglected child? None of these questions strike us as being ministerial questions. To answer these questions properly, there must be an exercise of judgment either based on education, training, or experience. These questions reflect the essence of policy considerations and thus are examples of discretionary acts.

10

The decision whether to remove a child from a parent's home is not a ministerial task. The determination that abuse or neglect exists and what steps should be taken in a particular case are the kinds of decisions that the Legislature intended to put beyond judicial review. These situations involve high risk and changing circumstances that require individual decision making, exercise of judgment, and use of skill. DCF must make delicate and complex judgments, weighing and balancing individualized risks. Those decisions do not become ministerial once DCF formulates a written case plan. Even under a written case plan, child custody decisions are not like deciding how to mop a floor, such as in *Allen*. At least, at first glimpse, it appears DCF is immune from liability.

Thus, applying the law persuades us that these were discretionary acts by DCF and therefore immune.

But our view could change if DCF undertook a common law duty when contracting with KVC to render services to A.O. See *Williams*, 310 Kan. at 798-99.

We hold that the district court did not err when it ruled that DCF was immune from liability under the Act because the manner of investigating child abuse cases is a discretionary function. But this holding does not shut the door on all of Osborn's claims, as we explain later.

*Under the public duty doctrine, state officials, employees, and government contractors, are not civilly liable for performing duties owed to the public at large.*

In granting the motion to dismiss, the district court held that there was no evidence of a special duty of care owed by DCF here because A.O. was not in the custody of DCF. And the acts of investigating and providing services to protect potentially abused children are part of a public duty which is not owed to an individual and thus does not create a

11

special relationship. The court held that DCF owed only a duty to the public at large and did not owe a special duty to A.O.

Osborn's claim is for the wrongful death of his son, based on negligence. To prove a negligence claim, he would have to establish that DCF owed A.O. a duty of care. Under the public duty doctrine, a government agency is not liable for performing duties owed to the public at large. "The mere fact that a governmental entity owes a legal duty to the public at large does not establish that the governmental entity owed a duty to an individual member of the public." *Williams*, 310 Kan. at 788. To be liable, DCF must have had a special relationship with A.O. or have owed a specific duty to A.O. individually rather than to the public at large. See *Montgomery*, 311 Kan. at 653; *Williams*, 310 Kan. at 788.

Special relationships that may justify such a duty include parent and child, master, and servant, the possessors of land and licensees, persons in charge of one with dangerous propensities and third parties, and persons with custody of another and third parties. *Williams*, 310 Kan. at 789. None of these special relationships apply here.

We move now to the concept of specific duty that can create liability. A specific duty can be created by law. In *Montgomery*, the court held the statutory duty on law enforcement officers in pursuit under K.S.A. 8-1506(d) to "drive with due regard for the safety of all persons" was a specific duty owed to all persons and thus law enforcement could be held liable for breach of this duty. The court distinguished this specific duty from general duties—such as the duty to preserve the peace—which law enforcement owes to the public at large. 311 Kan. at 655.

In contrast, precedent teaches us that DCF owes no statutory duty to individuals. The statute, K.S.A. 2020 Supp. 38-2230 (formerly K.S.A. 38-1524), provides, "If reasonable grounds to believe abuse or neglect exist, immediate steps shall be taken to

12

protect the health and welfare of the abused or neglected child." Under *Montgomery*, the duty under K.S.A. 2020 Supp. 38-2230 would appear to be a duty owed to specific individuals—the abused or neglected children. But our Supreme Court has held repeatedly the statutory duty under K.S.A. 38-2230 is a duty owed to the public at large. See, e.g., *P.W. v. Kansas Dept. of Social & Rehabilitation Services*, 255 Kan. 827, 835, 877 P.2d 430 (1994).

But there are always exceptions. A duty owed to the public may become a duty owed to an individual where the governmental entity "has performed some affirmative act that causes injury or where it had made a specific promise or representation that under the circumstances creates a justifiable reliance on the part of the person injured." *P.W.*, 255 Kan. at 835-36.

In addition, a common law duty may arise when an agency renders services to another under the rule found in Restatement (Second) of Torts § 323 and § 324A (1965). "The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all." *Williams*, 310 Kan. at 791. Under Restatement (Second) of Torts § 323, a duty arises when one undertakes "to render services to another which he should recognize as necessary for the protection of the other's person" if the failure to exercise reasonable care increases the risk of harm or the harm is suffered because of the other's reliance on the undertaking. The duty under Restatement (Second) of Torts § 324A is similar except it applies when one undertakes "to render services to another which he should recognize as necessary for the protection of a third person." The factual scope of the undertaking defines the scope of the duty. *Williams*, 310 Kan. at 792-93.

In *Williams*, a public duty turned into an individual duty. Plaintiffs called police when bail bondsmen were trying to force their way into the plaintiffs' home. Officers responded to the call, remained at the scene for a time, observed the bail bondsmen force

13

their way into the residence, spoke to one of the bail bondsmen, initiated an investigation, but then left the scene without intervening. The court held the plaintiffs alleged sufficient facts to support a claim that the police affirmatively undertook a specific duty to them individually to completely investigate the bail bondsmen who forced their way into their home, that went beyond the officer's public duty of responding to the 911 call. *Williams*, 310 Kan. at 793.

No duty arises where DCF investigates potential child abuse or neglect, but otherwise performs no affirmative act toward the plaintiffs. In *P.W.*, SRS investigated, but could not confirm, several allegations of abuse at a day care center. Plaintiffs were parents of children enrolled at the day care center. The court held SRS owed no duty to the plaintiffs because there was no evidence SRS performed any affirmative acts toward the plaintiffs or executed an agreement with the plaintiffs. 255 Kan. at 834. "SRS neither acted affirmatively, caused the injury, [n]or made any specific promise or representation to the plaintiffs which created any justifiable reliance." 255 Kan. at 835-36. The *P.W.* court stated:

> "'in all cases where it was found that the parties undertook to render services to another, they agreed to or were obligated to perform services for another that were accepted and thus the initial requirement of § 324A was met; and, in all cases where liability was not imposed, the defendants had no agreement and took no affirmative action that could be construed as an intentional undertaking to render services to another.'" 255 Kan. at 834.

But we must point out that it is not always clear whether DCF has undertaken an individual duty. There is one case from a divided court that we find significant. In *Roe v. Kansas Department of Social & Rehabilitation Services*, 278 Kan. 584, 102 P.3d 396 (2004), the court again held that providing services to protect abused or neglected children was a public duty not owed to an individual child. The facts of *Roe* are similar to this case. SRS learned of concerns that Baby Roe's parents were unable to care for the child at birth. SRS was told that the mother exhibited symptoms of psychosis and

depression, the father abused drugs and alcohol, and the father physically abused the mother. The Bureau of Indian Affairs agreed to provide daily supervision. SRS agreed to monitor the services provided by BIA. It was reported to SRS that the mother was afraid the father would hurt Baby Roe by shaking him too hard. SRS did not visit with the parents to follow up on this abuse report. SRS also did not follow up after the mother had to be hospitalized and had left Baby Roe in the father's care. Baby Roe was later taken to the hospital with a skull fracture and bleeding between the skull and brain. The baby was "permanently and profoundly mentally retarded." 278 Kan. at 590. Baby Roe's adoptive parents sued SRS. The district court granted summary judgment finding SRS owed no legal duty to Baby Roe. This court reversed and the Supreme Court granted review. 278 Kan. at 590.

A divided Supreme Court held SRS did not owe a duty "specifically to Baby Roe because the duty SRS undertook was part of its public, statutory duty." 278 Kan. at 594. The court found K.S.A. 38-1524 [now codified at 38-2230] was broad enough to cover the actions SRS undertook in that case and that SRS's agreement to monitor BIA's services was "only a limited or incidental undertaking which did not give rise to a § 324A duty." 278 Kan. at 594. The court held the agreement to monitor services by another was not an undertaking to prevent the abuse of Baby Roe. 278 Kan. at 595.

But (now Chief) Justice Luckert offered a thoughtful dissent that we find persuasive. She would have held SRS "voluntarily and affirmatively undertook to monitor the delivery of family support services for the care and protection of Baby Roe and as such owes a duty pursuant to Restatement (Second) of Torts § 324A (1964)." 278 Kan. at 595 (Luckert, J., dissenting). She noted that, "None of the cases cited by the majority regarding SRS's public duty foreclosed the possibility that SRS might be liable if it did undertake an affirmative act toward a plaintiff other than the performance of a statutory duty or discretionary function." 278 Kan. at 595 (Luckert, J., dissenting). She distinguished SRS's statutory duty to investigate reports of abuse and neglect from the

§ 324A tort duty. She agreed with the Court of Appeals majority that stated:

> "Precedent dictates that the statutory duty and any breach of it, no matter how obvious, cannot be relied upon by an abused child. To the extent that SRS deviated from its established policies for handling the late September abuse allegation or the early October neglect report and those deviations constituted a breach of its statutory duty to the public, they are relevant in this case only to the extent that a party charged with the tort duty SRS undertook voluntarily should have acted differently than Keady and Sramek. In short, it is the *statutory* duty that SRS did not owe to Baby Roe individually. We hold here, on these facts, it *did* owe him a *tort* duty. Under § 324A, SRS and its employees had to use reasonable care to monitor service delivery to the Tuthills to protect Baby Roe. SRS voluntarily and affirmatively undertook this obligation. Now, a jury must be permitted to decide the fact issues of whether defendants' conduct measured up to the § 324A standard and, if not, whether their failure was the proximate cause of Baby Roe's injury.' 32 Kan. App. 2d at 175." 278 Kan. at 596 (Luckert, J., dissenting).

Justice Luckert would have held that SRS undertook a duty outside its statutory responsibilities—that of monitoring another service provider (BIA) that was providing direct services to the child. She found that this undertaking "was specifically for the benefit of Baby Roe, not children in general." 278 Kan. at 596 (Luckert, J., dissenting). Thus, SRS undertook a duty under § 324A of the Restatement (Second) of Torts. Justice Luckert also disagreed with the majority that the undertaking was too limited to give rise to a duty. 278 Kan. at 596 (Luckert, J., dissenting).

This analysis is illuminating. Simply put, when a state agency chooses to do something for an individual or another entity, the agency becomes potentially liable for the negligent performance of those acts. This is because those acts are no longer for the benefit of the general public but are done for the benefit of the individual person or entity.

Earlier cases, looking at routine reports and investigations, emphasized that no individual duty was created where DCF merely investigated but took no affirmative act to render services nor agreed to do so. In *Beebe*, the court held that the "mere taking of a report regarding possible child abuse and the assurance to follow up that report does not constitute an undertaking to render specific services sufficient to create a legal duty on the part of SRS and its employees." 22 Kan. App. 2d 493, Syl. ¶ 1. There, SRS received two reports of suspected abuse and neglect of a child by her father. SRS said it would follow up. After reviewing the reports, SRS decided not to open a case for investigation. The child remained in her father's custody. The child died and her father was convicted of her murder. The court held SRS' promise to follow up was merely a promise to comply with its public duty in K.S.A. 38-1524 and did not create a duty to the individual child. The court also held SRS' failure to open a file did not increase the risk of harm to the child. 22 Kan. App. 2d at 496.

In *Burney*, SRS investigated and determined Burney had committed abuse of a student and advised the police. The court found no affirmative act to render services to Burney and no agreement to do so. "'Without an affirmative act or an agreement, there is no duty owed under § 324A.'" 23 Kan. App. 2d at 399. The court held since SRS owed no statutory duty to abused children under the public duty doctrine, it also owed no duty to the alleged abuser. 23 Kan. App. 2d at 398-99. The court also held the directives in the Kansas Manual of Youth Services created only a public duty to investigate allegations of child abuse. 23 Kan. App. 2d at 401; see *Kennedy*, 26 Kan. App. 2d at 102.

Then in *Watters*, the court acknowledged that "the minimum requirement for liability under § 324A or § 323 would be a showing that the Department provided services . . . in the form of affirmative acts outside of the Department's statutory responsibilities." 2015 WL 9456744, at *8. The court then held that Watters alleged sufficient facts to survive a motion to dismiss on the pleadings where Watters alleged

DCF made an agreement with the child's mother not to remove the child if the mother lived with the grandmother.

> "[I]t's possible that the Department took some affirmative actions that could have created a duty-the Department had previously taken a child from Alyssa's custody and knew that Jayla was born with drugs in her system. It allowed Alyssa to retain custody of Jayla only under certain circumstances but then did nothing even though it knew that Alyssa wasn't abiding by those conditions. Watters has plead sufficient facts to support his claim, at this stage, that the Department owed a duty under § 323 or § 324A." *Watters*, 2015 WL 9456744, at *8.

The court noted that all prior cases examining DCF's liability for harm to abused children were dismissed at the summary judgment stage, not on the pleadings. *Watters*, 2015 WL 9456744, at *9.

This research leads us to conclude that liability can only come from a special duty that requires some affirmative act or undertaking by the State, the agency, or its employees or officers that is outside their normal acts. Thus, our question becomes, do we have such an affirmative act here that could create liability?

Osborn contends DCF owed a common law duty to A.O. because it rendered services to A.O. under a written, agreed upon, and signed safety plan in effect at the time of the child's death that named Anderson as a risk to A.O.'s safety. Osborn cites *Watters*. He argues that by going beyond investigating and voluntarily planning to protect A.O., DCF had a special relationship that supported a duty in tort. He argues that there is a distinction between the investigation of child abuse and the delivery of services to families in need of services to keep their children safely in their homes. DCF concluded its investigation by determining A.O. needed services to ensure his safety and then DCF performed those services.

18

In response, DCF contends that the public duty doctrine precludes Osborn's claim because the investigation of child abuse, even if performed negligently, does not lead to a special duty. DCF argues there was no agreement or affirmative action outside DCF's statutory duties that could support imposition of a duty.

*P.W.*, *Beebe*, *Burney*, and *Kennedy* can all be distinguished because in those cases DCF did not render services to the abused child nor agree to do so. In those cases, DCF investigated but did not provide services to the abused child. In contrast, here, DCF did. DCF investigated and determined services were needed to protect A.O.

Based on the factual allegations in the second amended petition, DCF provided services to protect A.O. It contracted with KVC to provide those services and in so doing, it had a duty to exercise reasonable care that KVC would competently provide those services. This appears to be more than a public duty—but rather a duty specifically for the benefit of A.O.

The facts here are more like the facts in *Roe*. Applying the *Roe* majority view to this case, K.S.A. 2020 Supp. 38-2230 is broad enough to cover the actions DCF undertook in this case to provide services to A.O. Therefore, DCF owed only its public statutory duty. But unlike *Roe*, DCF's role here was more than "a limited or incidental undertaking which did not give rise to a § 324A duty." 278 Kan. at 594. In *Roe*, the BIA took the lead in providing services to the child and SRS took on a limited, secondary role. In *Roe*, the court held the plan to monitor services by another was not a plan to prevent the abuse of Baby Roe. 278 Kan. at 595. But BIA was not an independent contractor that DCF chose to provide services to the abused child, as KVC was here.

*The question here is, did the public duty DCF and KVC owed to A.O. turn into a private duty and thus make the agency and its contractor liable?*

We are duty-bound to follow Kansas Supreme Court precedent, unless there is an indication that the court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). *Roe* was a split decision and can be distinguished on the facts.

Our dilemma is thus manifest. Given the factual differences between this case and *Roe* and the *Roe* dissent's well-reasoned view, DCF may have owed a special duty to A.O. because it voluntarily and affirmatively sought to deliver family support services for the care and protection of A.O. through its chosen independent contractor, KVC. As alleged in the petition, DCF designed a written case plan to provide services to A.O. that was signed by both DCF and KVC. The case plan identified Anderson as a threat to A.O.'s safety. Did DCF then have a duty to shield A.O. from Anderson? If so, then this is a unique duty to A.O. After all, as an infant, he could not protect himself and, according to the petition, his mother could not protect him or failed to realize the danger to A.O. But DCF allowed A.O. to remain with his mother and Anderson even though his mother was not following the case plan. Osborn did allege facts that support the assumption of a common law duty.

We recognize that if we follow the *Roe* majority view, it is questionable whether DCF's acts are affirmative acts outside DCF's statutory responsibilities. *Watters*, 2015 WL 9456744, at *8. If they are not affirmative acts, then DCF cannot be liable. If we follow the view of the dissent in *Roe*, DCF could be liable.

Here is where the status of this litigation helps us to decide our ruling. We are not considering a motion for summary judgment but we are reviewing a judgment granted on the pleadings. We must follow the ruling in *Steckline*, 305 Kan. at 767-68, and view the

20

facts in the light most favorable to Osborn and draw all inferences from those facts in his favor as well. A claim for relief may be made on this point and we rule that dismissal of the petition on this point was improper. The *Watters* court ruled that alleging an agreement with the child's mother not to remove the child if the mother lived with the grandmother was enough to survive a motion for judgment on the pleadings. 2015 WL 9456744, at *8. Similarly, we hold that Osborn's allegations show that DCF owed a duty under Restatement (Second) of Torts, § 323 or § 324A, at least sufficiently to survive a motion for judgment on the pleadings. Considering the rulings in *Roe* and *Watters*, we reverse that ruling of the district court.

*Has Osborn alleged sufficient facts to permit a claim for negligent hiring of KVC under the Restatement (Second) of Torts, § 411?*

Osborn contends DCF is liable for negligent hiring and supervision of its independent contractor, KVC, because DCF knew or should have known about the deficiencies in KVC's delivery of services. Osborn contends DCF selected a negligent and careless contractor. Osborn contends KVC was negligent because, among other reasons, it employed unqualified personnel to provide services to A.O. Osborn contends DCF is liable under Restatement (Second) of Torts § 411(a) (1965) because KVC's work involved a risk of physical harm to A.O. if not skillfully and carefully done. Osborn also contends DCF is liable under § 411(b) because it owed a duty to A.O. as we explained above.

DCF contends it cannot be liable for negligent supervision of KVC because it did not owe a duty to A.O. since no special relationship existed between DCF and A.O.

Generally, the employer of an independent contractor is not liable for the negligence of the independent contractor. But there are exceptions to this rule. An employer can be liable for negligently employing an independent contractor as stated in

21

the Restatement (Second) of Torts § 411. *Dye v. WMC, Inc.*, 38 Kan. App. 2d 655, 662-63, 172 P.3d 49 (2007). This court adopted § 411 as the law of Kansas in *McDonnell v. Music Stand, Inc.*, 20 Kan. App. 2d 287, 293, 886 P.2d 895 (1994). The rule states:

> "An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons." Restatement (Second) of Torts § 411.

A "competent and careful contractor" is a contractor who possesses the knowledge, skill, experience, and available equipment which a reasonable person would realize that the contractor must have to do the work contracted for without creating unreasonable risk of injury to others. Restatement (Second) of Torts § 411, comment a (1965).

The theory is not vicarious liability. The employer is liable for the harm that results from the quality in the contractor which made it negligent for the employer to entrust the work to the contractor. *McVay v. Rich*, 255 Kan. 371, 376, 874 P.2d 641 (1994).

Once again, the scope of review comes into play at this point. Osborn may have a valid claim for negligent hiring of KVC based on the allegations in his amended petition.

When DCF has received confirmed reports of physical abuse and neglect of a child, DCF can make the discretionary decision to contract out the provision of community services to the family aimed at keeping the child in the home rather than remove the child from the home. That decision to keep the child in the home and provide services is a discretionary decision not subject to judicial review because it is a delicate

22

and complex judgment that involves weighing individual risks. But when DCF contracts out these services, it may undertake a common law duty under the Restatement (Second) of Torts § 411 to select a competent and careful contractor because if the contractor's work is not done skillfully and carefully done, there is a risk of physical harm to the child.

This is particularly true where the contractor's work involves making those delicate and complex judgments concerning abused children. Once DCF undertook this duty, it was no longer protected by the discretionary function exception because it had a mandatory common law duty. We note that DCF did not address whether the exception would still apply here.

When DCF executed an agreement with KVC to provide services to A.O.—the written and signed case plan providing that KVC would provide services to A.O. and naming Anderson as a risk to A.O.'s safety—DCF undertook a duty not just to the public at large, but to A.O. individually. Prior cases have not addressed whether contracting with an independent contractor to provide services to a particular child goes beyond DCF's public duty. The answer depends on the circumstances. DCF has undertaken a common law duty to hire a competent and careful contractor. DCF affirmatively sought to provide services specifically to A.O. through the contractor that it selected, and the court has recognized that a public duty may become a duty owed to an individual when DCF performs an affirmative act or makes a specific promise to an individual. DCF can thus potentially be sued for negligent hiring of an independent contractor in this case.

Because the allegations in the petition do not clearly demonstrate that Osborn does not have a claim of a special duty, then according to *Steckline*, dismissal on the pleadings was improper.

23

We turn now to the three issues pertaining to KVC.

- Did the district court err in ruling that Osborn's claim was a tort and not a contract claim?
- Was the statute of limitations tolled until after this court ruled Osborn had standing to sue?
- Did Osborn's claim against KVC relate back to his first petition?

*Can Osborn turn his claim into a contract claim and thus avoid applying the 2-year tort statute of limitations?*

Based on the nature and substance of the facts alleged in Osborn's petition, the district court ruled that this was not a contract action but really a tort action. Osborn was trying to establish a bodily injury survival claim, not a breach of contract claim. The damages would be too remote and speculative to be contract damages.

To us, Osborn contends the district court's ruling overlooks the liberal notice pleading requirements in Kansas. He argues he alleged many facts to support a breach of contract claim against KVC. In fact, he attached a copy of the contract to the petition. He alleged that the purpose of the contract between KVC and DCF was to deliver services necessary to keep children safe. In his view, the contract KVC promised to employ qualified people and perform a level of service necessary to protect the children referred to KVC by DCF. He contends that KVC breached its agreement with DCF to protect abused children, and that A.O., as a third-party beneficiary of the contract, had a right to enforce the contract. He argues he could prove damages by presenting evidence of the value of A.O.'s services through the age of majority and medical bills from A.O.'s injury.

But saying a car is a Chevy does not make it a Chevy. You have to look deeper to find out. Simply put, a plaintiff cannot characterize a tort action as a contract action to

evade the statute of limitations. *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 376, 552 P.2d 885 (1976). We too must look deeper.

In deciding whether Osborn's claim arises in tort or contract, the fact that a contractual relationship exists does not control. The pleadings must be examined to determine *the nature of the duty alleged to have been breached.*

"Whether a claim sounds in tort or contract is determined by the nature and substance of the facts alleged in the pleadings. A breach of contract claim is the failure to perform a duty arising from a contract, and a tort claim is the violation of duty imposed by law, independent of the contract. But the fact that the parties have a contractual relationship does not necessarily control the inquiry because legal duties may arise even though the parties also have a contract, so that '[w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of circumstances surrounding or attending the transaction, the breach of the duty is a tort.' [Citations omitted.]" *David v. Hett*, 293 Kan. 679, 701, 270 P.3d 1102 (2011).

The difference between a tort and contract action is that a breach of contract is a failure to perform a duty arising by agreement and a tort violates a duty imposed by law. *Tamarac Dev. Co. v. Delamater, Freund & Assocs., P.A.*, 234 Kan. 618, 619-20, 675 P.2d 361 (1984).

Medical malpractice cases highlight this principle. When the plaintiff's complaint is that the treatment a physician provided was incomplete, incompetent, or unauthorized, and the patient suffered injury, then the complaint is that the physician failed to exercise that reasonable care, skill, and diligence which the law requires of physicians regardless of any express contract between the parties, and the action sounds in tort. *Malone*, 220 Kan. at 376. The treatment violates a duty imposed by law, not by contract.

25

But when a doctor and patient contract for a particular result above and beyond the doctor's ordinary duty, and if that result is not attained, the plaintiff has a cause of action for breach of contract. This cause of action is separate from malpractice, even though both may arise out of the same transaction. Malpractice is the failure to exercise requisite medical skill and is tortious, while an action in contract stems from a failure to perform a special agreement. See *Noel v. Proud*, 189 Kan. 6, Syl. ¶ 2, 367 P.2d 61 (1961). In that case a doctor promised that an operation would not make the plaintiff's hearing worse, but the operation did make plaintiff's hearing severely worse. Thus, the action was for a breach of contract. It violated a duty imposed by contract. 189 Kan. at 13.

*Osborn alleged KVC violated a common law duty and thus his lawsuit sounds in tort law, not contract law.*

In his petition, Osborn stated, "Plaintiff, as administrator of A.O.'s estate, brings a survival action as third-party beneficiary against KVC for breach of contract." He alleged that DCF and KVC entered into a written contract for delivery, administration, and management of services for children who needed care, that DCF was supposed to monitor KVC's delivery of services, and that DCF had a nondelegable duty to keep A.O. safe from harm.

He alleged that KVC promised to deliver services:
- With a degree of care for A.O.'s safety;
- in proportion to the danger that existed to A.O.;
- by qualified individuals;
- that protect A.O.'s health and safety;
- needed to help the parent safely maintain A.O. at home; and
  to notify DCF if A.O.'s safety was at risk.

Osborn also alleged KVC's contract made specific promises, such as providing a three-person team to deliver services to children referred to KVC by DCF including a supervisor, case manager, and a support worker—each with specific tasks.

He alleged KVC failed to:

- Exercise a degree of care in providing services to A.O. necessary for A.O.'s safety;
- provide services in proportion to the danger that existed to A.O.;
- use qualified individuals to provide the services;
- provide appropriate services;
- notify DCF when A.O.'s safety was at risk;
- provide services to A.O.'s mother;
- conduct background checks, home visits, and office visits; and
- screen and diagnose A.O. to identify signs of abuse and neglect.

All of these are allegations of a violation of a common law duty.

When KVC agreed to provide services to A.O., it would have had a common law duty to exercise reasonable care as we discussed above. The question becomes whether KVC contracted for a specific result here and thereby undertook a duty higher than that imposed by law? The answer is no. KVC did not contract for a specific result in A.O.'s case. Osborn alleged KVC failed to exercise that reasonable care, skill, and diligence which the law requires regardless of any express contract between the parties. This action sounds in tort and the district court properly ruled so.

*Osborn has not shown us that the statute of limitations should be tolled in this case. The record does not show circumstances that would compel us to rule otherwise.*

In appealing the district court's ruling that his claims against KVC are barred by the two-year statute of limitations, Osborn makes two contentions. He argues that his claim against KVC was filed within the two-year tort statute of limitations because his cause of action did not accrue until December 3, 2018, when this court held that he had standing to sue. And A.O.'s injury was not ascertainable until DCF's confidential records were released during discovery in 2019. In other words, he is arguing an equitable tolling of the law.

He argues DCF concealed these records and misrepresented facts in its answer to the petition by disavowing any involvement with A.O. other than receiving two hotline calls.

In opposition, KVC contends Osborn failed to raise these issues before the district court and therefore cannot raise them on appeal. In a reply brief, Osborn contends this court can review these issues for the first time on appeal because they are questions of law on undisputed facts.

KVC also contends the tort claims accrued on the date of A.O.'s death—April 28, 2015. Osborn could reasonably determine A.O.'s injury when A.O. died. And since Osborn has always maintained he was A.O.'s father and had standing to sue, the appeal merely affirmed that. KVC argues that it was Osborn's lack of reasonable diligence that prevented him from knowing KVC was a potential party, not DCF's concealment of KVC.

KVC argues there is no evidence that DCF concealed, altered, falsified, or otherwise misrepresented the facts of A.O.'s death. As A.O.'s parent, Osborn could have

28

requested the DCF records within the limitations period under K.S.A. 38-2212(c) or talked to A.O.'s mother to obtain this knowledge. And KVC argues its employees were subpoenaed for Anderson's murder trial and were at the hospital before A.O.'s death.

Osborn is appealing from an order granting a motion to dismiss based on the statute of limitations. This court's standard of review is de novo, with the court construing the well-pleaded facts in a light most favorable to the plaintiff. *McCormick v. City of Lawrence*, 278 Kan. 797, 798, 104 P.3d 991 (2005). The equitable tolling argument Osborn raises for the first time on appeal requires factual determinations, and Osborn did not plead sufficient facts that support it. To the extent additional facts would support his argument for tolling the statute of limitations, he should have raised this issue before the district court.

Osborn does not support with authority his claim that the statute of limitations did not begin to run until this court ruled he had standing to sue. He cites *Pizel v. Zuspann*, 247 Kan. 54, 54, 795 P.2d 42, *opinion modified on denial of reh'g*, 247 Kan. 699, 803 P.2d 205 (1990). The *Pizel* court held that the cause of action for legal malpractice against the preparer of a trust did not accrue until the trust was declared invalid by the trial court because that was the date the plaintiffs suffered injury. The court also held the statute of limitations was tolled while the matter was pending on appeal because plaintiffs were effectively precluded from bringing the action until a final determination of the trust's validity was made on appeal. 247 Kan. at 77. That case offers little help here.

Dates are important here. Osborn suffered injury when A.O. died on April 28, 2015. His lawsuit was filed on April 25, 2017, three days before the two-year statute of limitations ran. A.O.'s mother, on May 17, 2017, was the first to file an answer challenging standing. The district court, on February 13, 2018, ruled that Osborn lacked standing. This timeline shows that the statute of limitations expired before Osborn's standing was questioned and long before the case was on appeal to this court.

When we examine Osborn's second amended petition, we see that he, in compliance with K.S.A. 2020 Supp. 60- 209(f), alleged the date of his son's death. The district court could thus take notice of the date of the petition's filing and the date of death and hold that the petition was time-barred.

The law is straightforward on this point. A cause of action for wrongful death accrues on the date of death unless information about the fact of death or the wrongful act that caused the death was concealed, altered, falsified, inaccurate, or misrepresented. K.S.A. 60-513; *Martin v. Naik*, 297 Kan. 241, 242, 300 P.3d 625 (2013). The plaintiff has an obligation "to investigate the factual sources available after a tragic death . . . . The wrongful death plaintiff is charged with constructive knowledge of information that is available through a reasonable investigation of sources that contain the facts of the death and its wrongful causation." *Davidson v. Denning*, 259 Kan. 659, 678, 914 P.2d 936 (1996).

In his petition, Osborn alleged that DCF received two hotline reports alleging neglect and abuse of A.O., that DCF made a preliminary inquiry, opened a file, commenced an active investigation, and rendered services to A.O. before A.O.'s death. In response, DCF stated that it "admits only that DCF received one 'hotline' report of alleged abuse/neglect regarding A.O. on February 27, 2015, and a subsequent report on March 2, 2015, and that the reports are the best evidence of what was alleged, investigated, and the findings of DCF." It is understandable why Osborn finds this response misleading given that DCF's involvement consisted of much more than "only" receiving two hotline reports. But the statute of limitations had run.

Osborn does not allege any steps he took to obtain the DCF records, find out what happened from A.O.'s mother, or talk to other witnesses before the statute of limitations had run—which was three days after the original petition was filed and before DCF filed its answer. Osborn served DCF with his discovery request after the statute of limitations

30

had run. He has not alleged that he conducted a reasonable investigation before the statute of limitations had expired, but that the records were concealed. He could have requested the DCF records under K.S.A. 2020 Supp. 38-2212. It is possible that DCF would have denied his request for records. But we do not know because there is no indication that he tried to obtain them. DCF did not deny his parentage of A.O. until after A.O.'s mother filed her answer denying his parentage. If Osborn had struggled with DCF to obtain the records after A.O.'s death but was denied the records, then the statute of limitations may have been tolled. See *Omar ex rel. Cannon v. Lindsey*, 328 F. Supp. 2d 1287, 1291 (D. Fla. 2004). But here, while DCF's answer was misleading, it did not affect the statute of limitations in this case. Osborn was not misled until after his time had run out.

Osborn's claims against KVC are barred by the statute of limitations.

*Because Osborn's claim against KVC does not relate back to the original petition, he cannot avoid the bar of the statute of limitations.*

Osborn contends his claim against KVC relates back under K.S.A. 2020 Supp. 60-215(c)(3) and thus his lawsuit is not time barred. He argues his failure to name KVC as a defendant was not a strategic choice; but that he was unaware that KVC provided services to A.O. He contends KVC had constructive knowledge of the suit through DCF and KVC would not be prejudiced.

KVC takes the opposite position. It contends the amended petition does not relate back because this is not a case of mistaken identity nor a case of an incorrectly named defendant. In its view, Osborn tried to add a new party and made new claims along with the existing parties and claims. KVC argues Osborn should have used reasonable diligence to determine what parties could be named as defendants. KVC contends it did

31

not have notice of the suit before the expiration of the statute of limitations and would be prejudiced by that delay.

For its part, the district court made a comprehensive ruling. It held none of the provisions of K.S.A. 2020 Supp 60-215 would permit Osborn's second amended petition to relate back to avoid the statute of limitations. Osborn added a new claim against a new defendant that he did not intend to name from the beginning. The court ruled K.S.A. 2020 Supp. 60-215(c) was not intended to give plaintiffs a second chance when they fail to name all of the proper parties prior to the expiration of the statute of limitations. Its purpose is to provide a remedy when a plaintiff was mistaken about the proper identity of a defendant it did name. The court also ruled there was no evidence KVC had notice of the lawsuit before the expiration of the statute of limitations and that joining KVC late would be prejudicial to KVC. The court ruled Osborn knew or should have known DCF had a history of contracting for services in child abuse cases.

The statute controls this issue. Under K.S.A. 2020 Supp. 60-215(c), an amendment to a pleading relates back to the date of the original pleading when certain conditions exist:

> "(1) The law that provides the applicable statute of limitations allows relation back;
> "(2) the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out, or attempted to be set out, in the original pleading; or
> "(3) the amendment changes the party or the naming of the party against whom a claim is asserted, if paragraph (2) is satisfied and if, within the period provided by law for commencing the action against the party, including the period for service of process under K.S.A. 60-203, and amendments thereto, the party to be brought in by amendment:
>> (A) Received such notice of the action that it will not be prejudiced in defending on the merits; and
>> (B) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

Through this, a party may avoid the "harsh application of the statute of limitations . . . where there has been a good faith attempt to properly name and join the intended defendant but that attempt has been thwarted through some honest mistake in the identity of the proper defendant." *Martindale v. Robert T. Tenny, M.D., P.A.*, 250 Kan. 621, 643, 829 P.2d 561 (1992). The statute was not intended to apply to a factual situation in which the proper identity of the intended defendant was always known, but no attempt was made to join them as a defendant until after the statute of limitations had run. 250 Kan. at 643.

In fact, the *Martindale* court, 250 Kan. at 638-42, gave examples of some proper applications of K.S.A. 2020 Supp. 60-215(c) such as

- when a defendant was erroneously named "United Cab Co., a Kansas corporation," rather than by its proper name "United Cab Co., Inc." and
- when the proper defendant was named in the petition as "J.A. Tobin" rather than "J.E. Tobin."

All the examples involved situations in which the plaintiff "intended from the outset to sue the correct defendant but through some error did not actually have the exact name of the defendant." 250 Kan. at 642.

The *Martindale* court held that when a plaintiff chose to proceed against the defendant in a corporate capacity, rather than individually, there was no "mistake concerning the identity of the proper party" under K.S.A. 60-215(c) and the plaintiff did not have the right to change her mind and sue the defendant individually after the statute of limitations had expired. 250 Kan. at 642. For the statute to apply, there must be a "mistake concerning the identity of the proper party." The *Martindale* court emphasized that the plaintiff "had every opportunity to proceed properly with an action against" the individual defendant but failed to do so before the statute of limitations ran. 250 Kan. at 643.

We note that the *Martindale* court did *not* say whether K.S.A. 2020 Supp. 60-215(c) would apply when, as here, the plaintiff did not know about a possible party's involvement in the case until after the statute of limitations had expired. Some later cases holding amendments to petitions did not relate back to the original date of the petitions have emphasized that the plaintiff "consciously chose" or made "a deliberate—that is, strategic—decision" not to sue the would-be defendant prior to the expiration of the statute of limitations. See *In re CEC Entertainment, Inc., Stockholder Litigation*, No. 120,234, 2019 WL 4725289, at *11 (Kan. App. 2019) (unpublished opinion); *Hoover v. St. Francis Health Center, Inc.*, No. 97,175, 2007 WL 2695840, at *1 (Kan. App. 2007) (unpublished opinion). That is not the case here. Osborn did not know that DCF had referred A.O.'s case to KVC until it was disclosed in discovery, which took place after the statute of limitations had run.

But Osborn's lack of knowledge of KVC's involvement differs from a mistake about the identity of the proper party that a plaintiff intended to name from the beginning of the case. And the amended petition here did not "change[] the party or the naming of the party against whom a claim is asserted" as required by K.S.A. 2020 Supp. 60-215(c)(3).

Simply put, the amended petition added a new party and a new claim. Thus, the amended petition does not relate back.

There is another cause for concern here. Osborn did not allege any facts in the amended petition that show "within the period provided by law for commencing the action" KVC received "notice of the action." Or that it "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." These allegations are required by K.S.A. 2020 Supp. 60-215(c)(3)(A)-(B). In other words, he failed to show that KVC knew or should have known about the lawsuit before the expiration of the statute of limitations.

34

The record shows that in response to KVC's motion to dismiss, Osborn alleged that "KVC, as an instrument of DCF, had constructive knowledge of the lawsuit through its parent, DCF, who knew the identity of the proper parties to this suit all along." But this is not persuasive. Osborn alleged in his petition that KVC was an independent contractor of DCF. He cites no authority nor any rule that KVC, as an independent contractor of DCF, would have had constructive knowledge of the petition in the three days between the time the petition was filed and when the statute of limitations expired. To us, that means the amended petition does not relate back to the original date of the petition.

Osborn's lawsuit against KVC is barred by the statute of limitations.

Given our standard of review for judgments on the pleadings, we reverse the district court's dismissal of two of Osborn's claims against DCF: DCF's special duty and its negligent supervision of KVC. We remand the case to the district court for further proceedings in accordance with our ruling. We affirm the district court's dismissal of all other claims against DCF.

We affirm the district court's dismissal of Osborn's claims against KVC.

Affirmed in part, reversed in part, and remanded with directions.

* * *

ATCHESON, J., concurring: While I fully agree we should remand this action to the district court for further proceedings, there is another avenue of potential liability facing the State of Kansas that goes unexplored in the majority opinion. Because we are reviewing a judgment on the pleadings, we should allow Franklin James Osborn's action to proceed if the factual allegations in the second amended petition and the answer appear

to support any colorable theory of recovery. On remand, Osborn may choose to pursue some or all of those theories, since he is the master of the claims he advances. See *Golden v. Den-Mat Corp.*, 47 Kan. App. 2d 450, 463, 276 P.3d 773 (2012).

Before getting too far along, I agree the claims against KVC Health Systems, Inc. are barred because the governing limitations period has run and Osborn has not shown any exception would save them.

So, what additional claim might Osborn have? The Revised Kansas Code for Care of Children appears to impose a nondelegable duty on the Secretary of the Department for Children and Families (DCF)—and, hence, the State—to protect a child the agency has determined to be abused or neglected. K.S.A. 2020 Supp. 38-2230. That statutory obligation is not framed as an abstract public duty but one owed to the particular child found to be in distress. In turn, the State may be held liable for the deficient performance of that duty consistent with the Kansas Tort Claims Act (KTCA). Based on the circumstances outlined in the pleadings, the State owed A.O. such a duty.

Had DCF attempted to fulfill the duty of protection due A.O. through its own employees, the agency could have asserted discretionary function immunity under the KTCA. K.S.A. 75-6104(e). But the agency hired KVC as an independent contractor to perform that duty. Because the duty is nondelegable, DCF remained legally responsible and can now be held to answer for KVC's allegedly negligent performance of the duty of protection owed A.O. Moreover, as a private independent contractor, KVC is not a governmental entity covered under the KTCA and, therefore, could not assert any of the immunities to tort liability available to those entities. In turn, DCF may not claim those immunities, since it passed its legal duty on to KVC, and DCF's resulting liability reflects vicarious responsibility for KVC's negligence. In short, by transferring that duty to KVC, DCF shed the protections of the KTCA for how the duty was performed. And KVC's statute of limitations defense likely does not shield DCF for its vicarious liability.

36

The sequential steps outlining DCF's liability on this ground go this way:

• DCF has dual statutory duties under K.S.A. 2020 Supp. 38-2230. The statute provides in pertinent part:

> "Whenever any person furnishes information to the secretary that a child appears to be a child in need of care, the department shall make a preliminary inquiry to determine whether the interests of the child require further action be taken. . . . If reasonable grounds to believe abuse or neglect exist, immediate steps shall be taken to protect the health and welfare of the abused or neglected child as well as that of any other child under the same care who may be harmed by abuse or neglect." K.S.A. 2020 Supp. 38-2230.

The statute imposes two distinct obligations on DCF. The first is to investigate reports that a child may be in need of care—the "preliminary inquiry." The second obligation arises when a particular investigation indicates an identified child to be abused or neglected—the "immediate steps" for protection.

The statute, thus, defines a mandatory duty of protection; the phrase "shall be taken" commands as much. See *Gannon v. State*, 298 Kan. 1107, 1141, 319 P.3d 1196 (2014) (use of "shall" in legal contexts ordinarily considered to establish mandatory rather than permissive action or obligation). And the language plainly identifies a particular recipient of the protection: the child found to be neglected or abused as a result of the investigation. DCF, then, has a statutory duty to take steps to protect that child. The duty is not an abstract one owed the public at large like providing police or fire protection to a community. See *Keiswetter v. State*, 304 Kan. 362, 365, 373 P.3d 803 (2016); *Robertson v. City of Topeka*, 231 Kan. 358, 363, 644 P.2d 458 (1982). Rather, it is a specific and special one arising from DCF's own investigative determination that a particular child has been and remains abused or neglected. See *Montgomery v. Saleh*, 311 Kan. 649, 654-55, 466 P.3d 902 (2020) (By requiring emergency vehicle drivers to

37

exercise "due regard for the safety of all persons," K.S.A. 8-1506[d] creates an enforceable obligation due those persons rather than a public duty.).

The Kansas Supreme Court has characterized the initial obligation to inquire or investigate as a public duty, meaning it is owed to the citizenry at large rather than to an identifiable individual or a recognized class of persons and its breach, therefore, cannot create tort liability. *P.W. v. Kansas Dept. of Social & Rehabilitation Services*, 255 Kan. 827, 835-36, 877 P.2d 430 (1994) (considering public duty doctrine as applied to identical language in statutory antecedent to K.S.A. 2020 Supp. 38-2230); cf. *Estate of Randolph v. City of Wichita*, 57 Kan. App. 2d 686, 698, 459 P.3d 802 ("Actionable negligence first requires that the alleged wrongdoer owe a legally recognized duty of due care to the injured party, and the wrongdoer must then breach that duty in a way causing the injury."), *rev. denied* 312 Kan. 891 (2020). In *P.W.*, the court held the Department of Social and Rehabilitation Services (SRS), the predecessor agency to DCF, could not be liable for how it investigated four reports of abuse of children at a daycare center because the investigatory duty was owed the public at large. SRS could not confirm abuse in one report; in two others, the parents of the children declined to cooperate, so the files were closed; and in the fourth, a medical examination established the child had diaper rash rather than physical signs of abuse. Given those determinations, SRS never intervened to protect the children.

Parents of two children who attended the daycare then sued SRS and the Kansas Department of Health and Environment, which licensed the daycare, alleging negligence in failing to discover that a co-owner of the facility had been abusing children. The court held that SRS's duty to investigate was owed the public and could not legally support a negligence action for any harm to the children. The court remanded the case with directions to the district court to enter judgment for the defendants. In reaching its conclusion, the court pointed out SRS neither took an "affirmative act" that caused injury to the children nor made any specific representations that might convert the diffuse public

38

duty into an actionable specific duty. *P.W.*, 255 Kan. at 835-36. Given those circumstances, the court did not differentiate, let alone construe, the second statutory duty to protect a given child when an investigation suggests he or she is abused or neglected.

The court's later opinion in *Roe v. Kansas Department of Social & Rehabilitation Services*, 278 Kan. 584, 102 P.3d 396 (2004), is similarly unilluminating on the duty of protection following an investigation revealing probable neglect or abuse. The facts in *Roe* are unusual to say the least. Mother and Father lived in an apartment in what was described as a mental health facility. They had mental or cognitive impairments and histories of substance abuse. Father had an explosive temper and was prone to violent outbursts. After Mother became pregnant, staff at the facility contacted SRS over concerns that the couple might not be capable of parenting a newborn.

An SRS caseworker spoke briefly with Mother, who was defensive and uncooperative. Mother twice refused to talk with the caseworker later. The agency never completed an investigation and took no action. Immediately after Baby Roe was born, the federal Bureau of Indian Affairs stepped in and began providing services to the family because both parents had Native American heritage and Father was an enrolled member of a recognized tribe. In a series of meetings that included representatives of the residential facility, SRS, and the Bureau, the participants agreed the Bureau would directly assist the family and SRS would monitor the overall situation.

The arrangement was an ad hoc one that followed no established protocol and apparently was never reduced to writing. In recounting the circumstances after Father had inflicted injuries on Baby Roe that left the child with profound permanent mental impairments, the participants had varying recollections of which agency was to do precisely what. The evidence suggested the Bureau had not provided all of the in-home assistance it had described and the agencies did not respond to Mother's stated concern after she gave birth that Father might harm Baby Roe.

39

Baby Roe's adoptive parents sued SRS and several of its employees for damages based on the child's injuries and the agency's alleged negligence in failing to adequately oversee the delivery of services to Mother and Father. The court relied on *P.W.* and several Court of Appeals cases involving the investigation of possible child abuse and neglect to conclude SRS breached no duty owed Baby Roe under the circumstances. The agency never completed an investigation and provided no services. *Roe*, 278 Kan. at 594. The court ultimately characterized SRS's agreement to monitor the Bureau as a "limited" task unlike providing services and "certainly was not an undertaking to prevent the abuse of Baby Roe." 278 Kan. at 595. Although the court earlier alluded to the monitoring as a step taken to protect Baby Roe, it did not hold the statutory duty to protect following an investigation amounted to a public duty. And the somewhat discordant descriptions belie such a conclusion. The court affirmed the district court's judgment for SRS and its employees (reversing our court's split decision setting aside the judgment) because the ad hoc monitoring of the federal agency was simply too limited to create a legal duty. The *Roe* court did not presume to apply any statutory duty of protection.

In short, there to do not appear to be published Kansas cases construing the duty to protect in K.S.A. 38-2230 or its predecessor. As I have suggested, the statutory language readily supports a duty owed the individual child rather than a public duty. A governmental agent's obligation to act does not constitute a public duty simply because the obligation has been created by statute. See *Montgomery*, 311 Kan. at 654-55 (Legislature enacted enforceable duty falling outside public duty doctrine in K.S.A. 8-1506[d].). In other words, a statutory duty is not necessarily a duty owed the public generally. Conversely, in at least one instance, the Legislature has expressly invoked the public duty rule to limit the liability of governmental agents. K.S.A. 2020 Supp. 48-3602(c). The Legislature could have done so in K.S.A. 2020 Supp. 38-2230 to recast DCF's duty to protect a child the agency has identified as abused or neglected from an obviously individual one to a public one.

40

• Although the public duty doctrine does not usurp DCF's obligation to protect a child under K.S.A. 2020 Supp. 38-2230, the KTCA governs the agency's liability for its own employees in satisfying that obligation. The steps DCF typically would take to protect a child presumably would include an assessment of the parents' needs and the formulation of a plan for social service agencies and other entities to provide counseling, training, treatment, or other support. The assessment also might examine whether legal or physical custody of the child should be temporarily changed. Those sorts of decisions involve interdisciplinary evaluations and professional judgments. As such, they almost certainly constitute discretionary determinations shielded under the KTCA. K.S.A. 75-6104(e) (immunity for governmental agents performing discretionary functions or duties). The Kansas Supreme Court has recognized that similar decision-making entails protected discretionary functions. See *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 455-56, 912 P.2d 729 (1996) (SRS placement of children with their mother and monitoring of that placement involve "discriminating judgment between competing interests" shielded under KTCA discretionary function immunity); *Gloria G. v. Kansas Dept. of SRS*, 251 Kan. 179, 190-91, 833 P.2d 979 (1992) (SRS decision to remove child from foster care based on allegation foster placement's minor daughter engaged in inappropriate sexual contact with child reflected protected discretionary judgment); cf. *Hesler v. Osawatomie State Hospital*, 266 Kan. 616, 632-34, 971 P.2d 1169 (1999) (physician's decision to grant weekend pass to involuntarily committed patient at state psychiatric hospital "clearly falls within the discretionary function" immunity in K.S.A. 75-6104).

Discretionary function immunity is not, however, absolute. It protects choices among arguably reasonable options. But a governmental actor cannot claim protection for grossly negligent or wanton courses of conduct or intentionally wrongful actions even if they are selected from among other options. *Barrett v. U.S.D. No. 259*, 272 Kan. 250, 264, 32 P.3d 1156 (2001); *Estate of Randolph*, 57 Kan. App. 2d at 699. DCF would have some legal exposure if it directly undertook the duty of protection in K.S.A. 2020 Supp.

41

38-2230 and performed abysmally. But based on the allegations we must consider, DCF contracted with KVC to provide services and to perform the allied duty of protection.

• DCF's duty to protect in K.S.A. 2020 Supp. 38-2230 is nondelegable because it is grounded in a statute imposing a mandatory obligation on the agency that pertains to the safety of an identifiable person. See *Trout v. Koss Constr. Co.*, 240 Kan. 86, 93, 727 P.2d 450 (1986); *State v. Mwaura*, 4 Kan. App. 2d 738, 610 P.2d 662 (1980); Restatement (Second) of Torts § 424 (1965); 41 Am. Jur. 2d Independent Contractors § 44. The nature of the duty substantially expands DCF's legal exposure. As a general rule, a principal cannot be held liable for the negligence performance of an independent contractor it has hired. But the rule does not apply to nondelegable duties. Among the circumstances creating nondelegable duties are statutes imposing a specific obligation on the principal or when the obligation may cause injury to another if carelessly performed. *Trout*, 240 Kan. at 93; 41 Am. Jur. 2d Independent Contractors § 44. The statutory duty of protection easily fits within the recognized range of nondelegable duties.

Although a party charged with a nondelegable duty may, in fact, delegate the performance of the undertaking, that party continues to be legally responsible for the duty owed and, hence, the consequences of a deficient performance. Accordingly, DCF cannot insulate itself from liability by contracting with KVC or some other private agency to monitor and provide services to dysfunctional families that have come to the State's attention because an investigation has shown at least one child to be likely neglected or abused.

• As a contractor performing a nondelegable duty, KVC is expected to do the required work competently. KVC's failure to do so is imputed to DCF. So DCF's liability is vicarious; that is, the agency shares legal responsibility for KVC's poor performance. See *Trout*, 240 Kan. at 93 (Kansas Department of Transportation had legal "responsibility" for independent contractor's negligent performance of agency's

42

nondelegable duty to maintain highway in reasonably safe conditions when department hired contractor to resurface road and replace adjacent fencing); see also *Machado v. City of Hartford*, 292 Conn. 364, 371-72, 972 A.2d 724 (2009) (employer of independent contractor vicariously liable for contractor's negligent performance of nondelegable duty); *Watkins v. First South Utility Const., Inc.*, 284 Ga. App. 547, 548-49, 644 S.E.2d 449 (2007) (recognizing employer vicariously liable for negligence of independent contractor in performing nondelegable duty imposed on employer by contract or statute). Likewise, as a private corporate entity engaged as an independent contractor providing family rehabilitative services, KVC enjoys no immunities or other limitations on its liability under the KTCA. See K.S.A. 75-6102(d)(2)(B) (independent contractors not considered employees for purposes of KTCA except in limited circumstances inapplicable here). So, for example, KVC cannot claim discretionary function immunity, as a governmental agency could under K.S.A. 75-6104(e). In short, KVC may be sued for the professionally negligent performance of the work it performs under contract with DCF.

Because DCF's liability is vicarious or derivative of KVC's performance of the nondelegable duty of protection, DCF cannot invoke protections under the KTCA that neither apply to nor shield KVC. There are none, so DCF may not limit its vicarious liability by relying on the KTCA.

This is consistent with the treatment of a state agency's nondelegable duty in *Trout* when the agency has handed off performance of the underlying obligation to a private contractor. 240 Kan. at 93-94. And it conforms to the structure of the KTCA. The KTCA expressly immunizes governmental entities for claims based on services nonprofit contractors provide through juvenile justice programs. K.S.A. 75-6104(u). Such protection would be unnecessary were the governmental agents otherwise shielded when they contract out services. See *Christopher v. State*, 36 Kan. App. 2d 697, 709-10, 143 P.3d 685 (2006) (reasoned policy basis for K.S.A. 75-6104[u] lies in allowing State to

contract with third parties to provide educational services to juvenile offenders without incurring liability for their negligence or otherwise becoming embroiled in litigation). The specific immunity extended in K.S.A. 75-6104(u) indicates comparable protection does not apply to similar contractual arrangements such as DCF's use of KVC. See *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 290, 261 P.3d 943 (2011) ("Under the KTCA, liability is the rule, and the exceptions . . . are to be narrowly construed."). Had the Legislature intended broader immunity for government agencies contracting with private entities, the KTCA would have been crafted to reflect that policy choice.

It follows that a state agency may not evade liability simply by outsourcing to private contractors undertakings entailing nondelegable duties. To the contrary, sound public policy favors imposing vicarious liability in that circumstance. First, of course, the state agency may choose to perform the undertaking with its own employees—triggering coverage (and protections) under the KTCA. Second, a state agency deciding to contract with a private party then has a strong financial incentive to take reasonable steps to determine that the party can adequately perform the undertaking and to monitor the party's ongoing performance throughout the term of the arrangement—liability that dovetails with and buttresses the agency's independent duty to select a competent contractor. See *Estate of Belden*, 46 Kan. App. 2d at 273 (tort liability promotes vigilance of governmental agents in performing their duties).

DCF could not avoid imposition of liability by contracting out the duty of protection it owed A.O., assuming the arrangement fell outside the scope of the KTCA because an independent contractor, rather than a governmental employee, performed negligently. Even if the KTCA were inapposite here, the court has recognized that common-law sovereign immunity does not protect governmental actors for the negligent performance of special duties owed identifiable individuals in contrast to public duties. See *Hendrix v. City of Topeka*, 231 Kan. 113, 122-23, 643 P.3d 129 (1982).

44

• A claim against DCF based on its vicarious liability for any negligence on the part of KVC in failing to take professionally reasonable steps to protect A.O. is not obviously barred by the two-year statute of limitations. So a limitations defense flowing to DCF, rather than to KVC, is not apparent on the face of the pleadings. When all is said and done, DCF might be able to successfully assert a limitations defense. But that is not the issue at this juncture.

Several interrelated rules bear on this point. First, a plaintiff need not sue both the principal and the agent to state a vicarious liability claim against the principal. Only the principal must be named as a defendant. See *Abshure v. Methodist Healthcare-Memphis Hospitals*, 325 S.W. 3d 98, 105, n.7 (Tenn. 2010) ("generally recognized" that plaintiff may sue principal alone based on vicarious liability for negligence of agent and citing authority from multiple jurisdictions); 3 Am. Jur. 2d Agency § 315. Second, the allegations against the State in Osborn's second amended petition relate back to the initial petition under K.S.A. 2020 Supp. 60-215(c)(2) and, therefore, should be treated as timely for statute of limitations purposes as to DCF, at least based on the pleadings. The vicarious liability claim for KVC's negligence arises out of "the conduct, transaction[,] or occurrence set out" in the initial petition, thereby satisfying the statutory requirements for relation back in K.S.A. 2020 Supp. 60-215(c)(2) especially since the original petition imparted notice of the wrongful circumstances causing legal harm to A.O. See 6A Wright & Miller, Federal Practice & Procedure: Civil § 1497 (3d ed. 2022) (discussing relation-back of amended pleadings under comparable section of Fed. R. Civ. Pro. 15[c]).

Osborn's original petition, therefore, was likely sufficient to put the State on notice of a vicarious liability claim, even though the pleading neither identified an independent contractor performing the duty of protection due A.O. nor used terminology imputing liability to the State for the conduct of an outside entity. The petition alleged DCF investigated A.O.'s circumstances, rendered services to A.O., and owed him a duty of protection that the agency breached, thereby causing harm. The petition alleged the

45

elements of a tort claim—a duty owed, breach of the duty, and an injury causally stemming from the breach. See *Estate of Belden*, 46 Kan. App. 2d 247, Syl. ¶ 7. DCF, of course, knew it had contracted with KVC and KVC had provided at least some of the services identified in the petition.

DCF, therefore, arguably had fair notice of a vicarious liability claim based on KVC's allegedly deficient performance of DCF's nondelegable duty of protection owed A.O. In turn, the agency should not have been either surprised or prejudiced by the more detailed claims in Osborn's second amended petition identifying KVC as the service provider. Should Osborn choose to pursue a claim against the State based on vicarious liability for KVC's conduct, the State may opt to assert an affirmative defense based on the statute of limitations. The point will then need to be litigated in the district court.

Under the circumstances outlined in the pleadings, KVC's statute of limitations defense would not pass through to the State to bar a vicarious liability claim. The State would be obligated to establish an independent legal basis for any limitations defense. See 3 Am. Jur. 2d Agency § 315 (improper to proceed against principal alone on vicarious liability of agent unless claim first raised before agent could have asserted procedural bar by operation of law). In a similar situation, the Tennessee Supreme Court found a general assertion in the plaintiff's initial pleading gave a defendant hospital sufficient notice of a vicarious liability claim for medical malpractice, thereby precluding judgment for the hospital based on a procedural bar available to the individual physicians alleged to have been negligent. *Abshure*, 325 S.W. 3d at 112. To like effect and in reliance on *Abshure*, among other cases, the Indiana Court of Appeals permitted a plaintiff to proceed with a professional negligence claim against a hospital on a vicarious liability theory even though two ostensibly negligent physicians had not been named as defendants and the statute of limitations had run as to them after the action had been filed. *Columbus Regional Hosp. v. Amburgey*, 976 N.E. 2d 709, 710 (Ind. Ct. App. 2012).

46

Looking at the pleadings alone, as we must in assessing DCF's motion to dismiss, the factual allegations set out a colorable vicarious liability claim against the agency for any negligence of KVC in taking steps to protect A.O. from continuing neglect or abuse. On remand, Osborn may choose to pursue such a claim or not. If he does, DCF may assert any additional defenses the agency believes may be applicable.